Jones et ux. *v.* Smith et al.

———

CHAMBERLAYNE JONES et ux. *v.* WILLIAM B. SMITH et al.

1. TRUSTEE: PURCHASER BY: FROM CESTUI QUE TRUST.—A trustee may purchase from the cestui que trust, the trust estate; but such a transaction will be regarded with suspicion, and criticised with the utmost rigor; and, if attacked by the cestui que trust, it is incumbent on the trustee to show that it was fair and just in all respects, and consummated on his part with the most abundant good faith, and that the cestui que trust had all the information in relation to the trust estate, possessed by the trustee. See 1 Lead. Cas. in Eq. 125.

2. SAME: CESTUI QUE TRUST MUST OBJECT IN A REASONABLE TIME.—Where the trustee has been guilty of no positive act of fraud in a purchase made by him from the cestui que trust of the trust estate, the latter will lose his right to

annul the agreement, for want of the *uberrima fides* required of trustees in such transactions, if he fail to take steps to set aside the contract in a reasonable time after its consummation. In such a case, the unreasonable delay, will be held to be a ratification of the sale by the cestui que trust. *Scott* v. *Freeland,* 7 S. & M. 419.

3. SAME.—The failure of the cestui que trust to take steps to set aside a sale made by him to the trustee of his trust estate, for three years and eight months, is unreasonable, where the trustee has not been guilty of any positive act of fraud or concealment.

4. CONTRACT : RESCISSION.—A rescission of a contract will not be decreed at the instance of a party guilty of negligence and unreasonable delay in asserting his rights, and when from a change of circumstances the parties cannot be restored to the same situation they occupied before the contract was made. See *Johnson* v. *Jones,* 13 S. & M. 583.

APPEAL from the District Chancery Court of Holly Springs. Hon. James F. Trotter, vice-chancellor.

The substance of the pleadings is fully set out in the opinion of the court. The evidence in the cause is substantially as follows:

### FOR COMPLAINANTS.

Josiah J. Hill. The property purchased by Smith on the plantation of Lewelling was worth, at the time of purchase, negroes, $24,300; land, $3840; other property, $2367, making $30,507. Was overseer from January, 1850, to August, 1851. Mrs. Jones lived with Cheairs, one-quarter of a mile from the place. Visited the place twice a week before the purchase, and after spent one-half her time there. Heard Smith say that he had asked Cheairs into the smoke-house, to avoid company, to get his consent to go into the trade ; that Cheairs consented. This conversation was between the 10th and 18th of June, 1851. Smith requested it to be kept secret till the writings were drawn. Mrs. Jones wanted to come on the farm and live with witness ; she applied to Cheairs for his consent, but he gave no answer.

To cross-interrogatory he answered: He bought and sold no slave in 1851 ; was the owner of one slave. Mrs. Jones occasionally saw some of the slaves about the house, and probably saw and knew all those about the place, and sometimes saw them. Mrs. Jones asked his advice as to the sale. He could give her none ; he referred her

to Mr. French. She had learned from Cheairs that the slaves would probably have to be sold to pay the debts. She hated to see them scattered. Lewelling was embarrassed in the spring of 1850. He was living at Memphis. He wrote to Cheairs to run the slaves to Alabama, and Cheairs started off with them. The crop was small in consequence of the slaves being run off. There was not corn or meat enough on the place to do for 1851. Smith bought about fifteen barrels of corn.

Thomas H. Allen stated that Smith and Cheairs paid the debts secured by the deed of trust, shortly after they matured. One of the notes went beyond maturity.

Thomas Watkins. Knew the property well. The negroes were worth, in June, 1851, $26,370; land, $4800; other property, $1830, making $32,740. Did business for Lewelling in 1849, and knew his property well, until his death. Smith stated to him and Craddock, that he and Cheairs were the owners of the entire estate of Lewelling; that he had taken Cheairs into his smoke-house, to avoid company; that they there agreed to purchase the estate; also heard Cheairs say that he and Smith had become the joint-purchasers of the entire estate. This last statement was in 1853. Smith stated that some of his relations had offered to purchase the property with him, but he preferred Cheairs, because he could manage the property better. Cheairs stated that there was due on the books to Lewelling & Woods, and of Lewelling, over $30,000. Witness has heard French repeatedly say, that he effected the trade between the parties.

Cross-examined. Was a slaveholder in 1851; owned about seven; bought one and sold one that year. Was applied to to collect the debts; refused, because the residence of debtors was not given.

David Harshaw knew most of the slaves. Lived near Lewelling fourteen years. Gives the value of thirty-one of them about the same as Watkins. Values the other property as Watkins, except the land, which he valued at $4000. Heard French say that he had effected the trade, and that he thought Smith would make several thousand dollars. Saw French frequently going to Cheairs; said his business was to effect this trade.

Cross-examined. Makes his deposition of property from memory and list furnished by Poole. Was a slaveholder; owned fourteen slaves. Slaves have increased in value since 1851.

M. L. Bost heard Cheairs, in 1851, say that he and Smith had purchased the entire estate from Mrs. Lewelling. Allen Dowdle heard French say, in summer of 1851, that he had that day made a trade with Mrs. Lewelling, by which Smith and Cheairs would clear $10,000. Heard French repeatedly speak of trying to effect the trade before it was done. Does not know the property.

John H. Webster heard Smith say, in the spring of 1851, that he was on his way to Memphis to see Mrs. Lewelling, and buy her interest in the estate, and he also said he thought there was money in it. Understood from Smith, that Mrs. Lewelling was then in Memphis, and his object was to get her to go out to his neighborhood. Slaves were commanding a fair price in 1851, but not as high as now. Bought three that year; owned ten.

A. R. Craddock heard French say, that he had acted as the agent of Mrs. Lewelling to effect the trade; that his object was to get his neck out of the halter, and when Smith and Cheairs had made the purchase he felt relieved. This occurred a few days after the trade. He says, that two or three months after the trade, he heard Smith state the conversation before stated by Watkins. Likely negro men were worth at the time of the trade $1000, and women $800. Shortly after the trade he offered Smith $3000 profit, for one-third interest in the trade. Smith declined, stating that he had as many partners as he wished. Cheairs valued the land at $4000, which is its value.

Cross-examined. Lewelling made some money at planting; not much. Report said he was broke in the spring of 1851; but when witness became his security, he considered his property sufficient to pay the debts.

On re-examination, witness states that he and Cheairs were the administrators of Lewelling in term, and they regarded the estate worth $10,000 after paying the debts. This was at the time they administered. They calculated that they would be able to save at least $10,000, out of the debts due on the books of Lewelling, and Woods & Lewelling.

F. F. Smith is the brother of Mrs. Jones. She was born November, 1821. She lived in Louisville, Ky., from June, 1851, until her marriage in November, 1853, except in 1852, she went to New York and Virginia. She was in deep distress in June, 1851. She seemed to

take but little interest in anything but building a vault for the remains of her husband.   Does not know of her having any correspondence in Tennessee or Mississippi, whilst in Louisville.

On cross-examination, states that the mental distress of his sister was greater than that he ever saw for a domestic bereavement. Could not induce her to take any interest in her business, and does not think in her then state of mind, she was capable of managing any business of importance with prudence or judgment.

B. A. Jones.  A short time after the trade Gibbons asked Smith if he would take $5000 for his bargain.  Smith replied No, that he wanted to shoulder a big debt to see how it felt, and see whether he could work out.

Cross-examined.  Gibbons was wealthy.  Negro fellows could have been bought at that time at $750 to $850.   Purchased a woman for $600 in Memphis, in 1850; was worth $650 or $700 in April, 1851.   Negroes commenced rising in 1850, and have gone up ever since.   The foregoing is the cash value of negroes.  Negroes acclimated are more valuable than those imported; are worth more on credit than for cash.

James Pool, it was agreed, would prove that about two months before the bill was filed, he went, at the instance of C. P. Poole, to see complainant, Jones.   That on his way he met him in Memphis.   That he told Jones all about the transaction.   That Jones started to Holly Springs to learn the facts.

### FOR DEFENDANTS.

M. P. Webb knew both Lewelling and wife.   Was clerk of Woods & Lewelling, then clerk of Lewelling, and after his death was employed by Cheairs, to collect the debts due Lewelling.   Not doing much at it, he resigned.   Made a statement to Mrs. Lewelling soon after L.'s death, of the condition of his estate.   Mrs. L. had no opportunity of knowing the condition of the estate, except what she got from witness, or Mr. Vance.  Witness made a statement to her, showing $15,400 as what would be the remainder of the estate, after paying debts.  Witness proposed to Smith, to buy.   He advised witness to do it, but witness could not, not being able. "And, in fact, I told him I would not settle it up, for it."   He said he might be induced to buy, but there was a woman in the

case. That if she would get a male friend to propose it, he would think of it. Witness told this to Mrs. L.; she objected; but eventually yielded, and agreed to confer with Mr. Smith, through Mr. French, her friend. She requested witness to send French over next day. Saw French next day, and then left for Tennessee. French and witness both expressed an opinion that she ought to sell. Witness communicated this opinion to Mrs. L., and she then invited him over. Witness thought if she could get $5000, she would do well. This was witness's suggestion to her. Mrs. L. was directed in her judgment by witness's report of unsuccessful collections, the prospect of litigation, and that her share would not, probably, exceed $5000 or $6000. Witness thought the price paid was full and adequate. Did not then know of any interest in Virginia lands. Saw her once after the sale; she said she thought Cheairs had some interest in the purchase. Thinks her judgment in selling was directed entirely by her friends.

Cross-examined. Was book-keeper part of the time of Lewelling. The sale by Mrs. L. was not mentioned by any one. Witness first suggested the sale. Cheairs was present when witness made the proposition to Smith. Witness went home with him, where Mrs. L. was. He said if the sale was made, it would not interfere with his administration. She was a widow, and a modest and retiring woman. Did at one time think there would be about $15,000 left after payment of debts. Furnished her with a statement to this effect. Did not mention the name of French, until after I mentioned his opinion to Mrs. L.; but I think I did advise her to consult with her friend, Mr. French. Lewelling had a cotton-shed worth $400 or $500. The amount I collected was about $184, from 1st March to 10th June. Witness made out a statement for Smith to show that the widow would be entitled to at least $5000. He made it at least $5822 12, after paying all commissions, charges, &c. &c. Heard Smith say he had advanced $7000 or $8000 to pay some urgent debts.

Jas. H. French. Mrs. L. sent for me; said she wished to sell, and thought Smith would buy; said she did not wish to stay in Mississippi, and was fearful the estate would be consumed in expenses and paying debts; requested him to see Smith; was willing to take $5000 or a house and lot in Memphis; got the parties

together at his house ; Smith consented to give the house and lot and $150 more ; Smith sent for C. L. Thomas, and had the writings drawn ; was the friend and adviser of Mrs. L., and seeing her determined to sell, thought she was doing the best that could be done. Did not persuade her to sell ; the transaction was fair and honorable ; believed there would be but little left after paying debts, and thinks he told her so ; learned the condition of the books and papers from Webb, and taking into consideration their tangled condition, believes the property was sold for its real worth. Mrs. L. was frequently on the farm ; knew the slaves, and conversed with Webb at his house about the affairs of the estate ; was one of Lewelling's securities ; at times felt a desire to be released, but not enough so to have Mrs. L. sacrifice one dollar. Cross-examined. Never did say to Craddock, Hill, or any one else, that he advised Mrs. L. to sell ; never did say he wished to get his neck out of the halter. Was intimate with Smith and Cheairs ; did not know the latter had any interest in the trade until told so by Smith ; was a man of family ; knew Mrs. L. fifteen or sixteen months. She was in a good deal of distress, at the time the trust was made. Believed from his statement that he could save considerable of his property ; Cheairs also thought so.

J. M. Patrick. Heard a conversation between Smith and Mrs. Lewelling after the contract was closed ; S. still offered to abandon it, but she was satisfied with it, and expressed her fears that she would not get anything from the estate. Her husband's remains were then taken up, and she was about to start with it to Louisville. S. paid her $350 in money.

C. L. Thomas, John Rook, Mosely, and Caruth, prove that Smith and Cheairs called on them in 1855 to value the slaves, as of 14th June, 1851. Defendants pointed out the negroes to them, stated their ages, condition, &c., and they valued thirty-six of the negroes as of 1851 at $18,400. Seven of the negroes they did not value, three being children and four being dead. They are all men of wealth, negro property, &c. They testify as to the good character of French. Mosely was a negro trader in 1851. Thomas had seen a few of the negroes ; the others had seen none of them. The valuation of the negroes was at cash valuation.

John Parham. Never saw but one of the negroes in contro-

versy.  Had a lot of forty-six negroes in 1851 and 1852 for sale; offered them for $24,000 ; could not sell; sold them to A. M. Clayton, in December, 1852, for $25,000, in six annual instalments, with six per cent. interest.   They were large and small ; had been in the country several years ; were above an average lot; thought the price fair; would not buy them himself at that price.   In 1851 bought negroes in Richmond and this State; all field hands; about equal in sex ; all except two of them were number one, at an average of little over $800.   Negroes were low in June, 1851; commenced rising shortly after, and have kept rising in value. Negroes would sell for more on credit than for cash.

Thomas Mull.   Has seen most of the slaves ; made a large purchase of slaves in 1851 from Howard, one-fifth cash, the balance in four annual instalments, with six per cent. interest.   Men were valued at $800, women $600, and children in proportion.   Considers he got a better bargain than Smith.   Property was dull at the time, and continued so till next winter, when property commenced rising, and has continued.   Negroes were lower in the summer than when he bought.   Howard had been offering his negroes before ; is the owner of a large number of slaves ; was Lewelling's security ; considered the estate bankrupt; felt uneasy about his suretyship, and made examinations into the affairs of the estate.   Negroes raised in families and acclimated are more valuable than imported ones.

J. F. Dowdy.   Saw Lewelling in Memphis the day after the negroes were run off.   Said he was ruined, not worth a dollar, and that Woods had done it.   Was the agent to collect the debts of the several firms of Woods & Lewelling, and of Lewelling, from '53 to '56.   Refers to a memorandum book containing list of debts ; believes the same correct; did not collect ten per cent. of the debts; does not believe the debts worth ten per cent.   Does not know that Smith had any control of trust property until after the purchase from Mrs. Lewelling.

S. G. Lancaster proves the conversation between Webb and Smith as stated by Webb.   Witness sold a good medium-sized girl, fifteen years old, in Marshall county, in May or June, 1851, for $550.   Had her on the market some time.   Same girl would now sell for $700 or $800.   Negroes have risen since.

D. Rogers.  Is administrator of Lewelling's estate; was one of his ·securities; felt uneasy about it; determined to wait a short time, and if the debts were not paid, intended to have the trust closed.  Talked with French on the subject, but arrived at no definite conclusion.  Lived near the trust property some fifteen years. Land worth $4000 at time of sale, and negroes what Thomas valued them at.  Helped divide the property between Smith and Cheairs; knows nothing about the property other than negroes and land.  Heard Gibbons say he would like to purchase the young negroes; did not want the old; did not want the whole lot.  His valuation of the negroes is a cash valuation.

J. J. Cook.  Has been a negro trader for ten or eleven years. Bought negroes in Kentucky and Tennessee in 1850 and 1851; paid for men from $550 to $700; average about $650; sold in Louisiana, women about $750, men $850 to $900.  Market for field hands in Louisiana, better than in North Mississippi, but for women and children less; the Louisiana market certainly not lower than North Mississippi.  Negroes have advanced $250 to $300 per head.  Negroes sold in large lots command less than in small lots. Acclimated negroes worth more than unacclimated.

*W. L. Sharkey,* for appellant.

This bill is filed to set aside the purchase of the trust property by a trustee, from the cestui que trust, who was the wife of the grantor, in the deed of trust, and became cestui que trust only by the devise to her of all his property by the grantor in the deed of trust.  She is not therefore a party to the original deed of trust, though she, of course, claims directly under it.  The effort is to set aside a sale of her own equity, to the trustee, which was made long before the debts were due, to secure which the deed of trust was made.

The defendants therefore must claim the property in dispute, if they claim in their own right, either in virtue of their purchase or by the Statute of Limitations.  For the property in dispute was the property of Lewelling, the grantor, in the deed of trust, and, of course, the defendants must derive title under him.

Their title therefore must be derived from some valid sale, or they must be in a condition to set up the Statute of Limitations.

The question of law must then be resolved into two.  Was it

competent for the trustee to purchase, or is he protected by the
Statute of Limitations, if the purchase was void?

First, was it competent for him to purchase the trust estate? We
maintain that it was not. How was a technical trust the creature
of a court of equity? As to the power of a trustee to purchase
the trust estate, there is a shade, and but a shade of difference
taken by the authorities. That difference consists in this: some
hold that there is an entire absence of competency in the trustee
to purchase, and that the sale will be set aside, as a matter of
course, on the application of the cestui que trust. The others hold,
that there is not an entire want of power to purchase, but it devolves
upon him to show, after a zealous and scrupulous investigation, the
entire fairness of the transaction, and not only so, but that he im-
parted to the cestui que trust all the information he possessed in
regard to the condition of the estate.

We care but little which of the rules may be adopted, as this
sale cannot be supported under either.

But we maintain that the trustee cannot purchase at all; and this
rule, we think, is the one best supported and sustained by the
American authorities, whatever the rule might have been in Eng-
land. See *Scott* v. *Freeland*, 7 S. & M. 409; *Davoue* v. *Fanning*,
2 John. Ch. R. 252; 1 Stor. Eq. Jur. sect. 321, 322; *Butler*
v. *Haskell*, 4 Desaus. 651; *Wormley* v. *Wormley*, 8 Wheaton,
421.

Now it will be observed, that this too is the more modern English
rule, as will be seen by the cases referred to in the case in 2 John.
Ch. R., to which we invite particular attention.

But suppose we are mistaken in the law as to the entire incapa-
city of the trustee to purchase, and that the true rule is, that he
may purchase, but it will be incumbent on him to prove entire fair-
ness, to show, on the most scrupulous investigation, that no ingre-
dient of personal interest, no suspicion of personal advantage,
entered into the transaction, and that he advised with, and im-
parted all the information, not that he possessed, but that his posi-
tion and his duty made his duty to possess, the result in this case
is precisely the same: it never can stand the required test. By
this rule, prima facie, the purchase was void, and the burden of
rebutting this presumption was on the defendants. Have they done

it ? They have not. It will be but too apparent on looking into the testimony, that cloud upon cloud hangs over the case. Suspicion covers the transaction from beginning to end. The proposition to sell was not made by complainant, but came from Smith through Webb, advised by French, the agent of Cheairs; the manner of the purchase; the inadequacy of price; the connivance between Smith, Cheairs, and French; the condition, pecuniary and mental, of complainant; the profert to rescind at Memphis, when complainant was then on her way to Louisville, with the remains of her husband, and could not rescind: all these points with direct certainty to the vicious motives of both Smith and Cheairs.

That Cheairs is an innocent party, cannot for a moment be pretended. He purchased with notice at least; but that is not all; he was undoubtedly interested in the purchase from the beginning, and contriving to bring it about. He was in fact direct trustee himself, being executor of Lewelling.

Nor is there any pretence that the trust was terminated at the time of the contract; on the contrary, it was in full force; it was made for the benefit of creditors, whose debts were not even then due. The complainant was only a cestui que trust, as to the widow, after the debts were paid.

Then if the respondents cannot protect themselves under their purchase from complainant, the next question is, can they do so by the Statute of Limitations ? This is a defence which, of course, is never set up, except as a dernier resort, when all others have failed, and if good at all, it must be good exclusive of all other defences; it cannot derive aid or strength from any other description of title. Then if it be good in this case, it would have been equally so, though complainant had made no sale.

. If the sale be void, and if it be set aside, either because the trustee had no power to purchase, or because he has not come within the rule which requires him to prove entire and complete fairness, then what is the condition of the respondents ? They stand as trustees, strict technical trustees, in a trust not even fully executed at the time of the commencement of this suit. Can they set up the Statute of Limitations ? To state the proposition is to refute it.

We have said that Cheairs is a trustee, as being a party to the

original purchaser; not only so, but by being a purchaser with full notice. But even if this be not so, he can have no title at all. He professes to derive title by the private sale of Smith, at a time when none of the debts were due; when Smith could not even have sold at public sale. But he had no power to make a private sale at all, and the attempt to do so, is enough of itself to set the whole transaction aside.

But we maintain that the Statute of Limitations cannot be interposed for many reasons. In the first place, this was not only a direct but a technical trust, and it was not destroyed or ended by the contract; it is indeed yet unterminated; and that such a trustee cannot set up the Statute of Limitations and protect himself by it, is too clear, too well settled, not only by this court but by every other, and it is sufficient to refer to the case of *Wren* v. *Gayden*, 1 How. Miss. R. 365.

But what statute is to be interposed? The complainant never had anything but a naked equity. The legal title was in the trustee. The statute does not apply to mere creatures of equity. There is nothing to furnish the analogy.

But again, the deed of trust was an entire contract, covering land and negroes. The contract with complainant was of the same character. Both are indivisible, and cannot be good in part and bad in part, or rescinded in part and permitted to stand in part, or barred in part and not barred as to the residue. The statute must make a complete bar, or none at all. Surely as to the land there can be no statute bar, and how is it expected that trust estate can be divided?

But another most conclusive reason why the statute cannot be interposed is, that it surely did not begin to run until there was some right, either at law or in equity, in the complainant; until there was an adverse possession. There was no pretence of right in complainant, until June, 1854, on the maturity of the last note. Suppose the sale never had been made by her, could she have filed even a bill in chancery before that time? Surely not. Even at the commencement of the suit, it appears the trust was not fully executed. Up to that time, then, the defendant's possession was not adverse, but perfectly consistent with complainant's right.

And for the same reason, lapse of time cannot be set up as an implied ratification of the contract. There has been no act of rati-

fication, either express or implied. On this subject we again refer to the case of *Butler* v. *Haskell.*

A few words will be added as to the inadequacy of price. There were about forty negroes and a tract of land, all the choses in action, and a tract of land in Virginia. The debts were due in one, two, three, and four years. The crops on the place alone would have paid more than half the debts, and with full crops and fair prices, they would have paid the whole, so that all the property was clear gain. The property in this State, was worth at the time of sale, at least $30,000, besides the effects in Tennessee; so that had the debts all been due, there would have been a gain of near seven thousand dollars on the property in this State alone; but the debts were not due for four years, and the income alone, might have been sufficient to pay them.

*H. W. Walter,* on same side.

The defendants, Smith and Cheairs, were both jointly interested in the purchase. This is charged in the sworn bill, and is not denied in the answer. An equivocation is attempted. The acknowledgment of Smith, to Hill, Watkins, Craddock, and Webster, to all of whom he detailed the taking of Cheairs into the smoke-house, and there making the contract of partnership with him; the acknowledgment of Cheairs to Hill and to Bost, that he and Smith had purchased the entire estate from Mrs. Lewelling, all show conclusively, that they were the joint-purchasers. The case then stands thus: a trustee and an executor purchase the trust estate from the cestui que trust and legatee.

We insist that the legatee may come in, and on her mere motion, may set aside this transaction, no matter how fair it may have been. The law will not suffer trades between parties thus situated to stand. 1 Stor. Eq. Jur. sect. 322; *Scott* v. *Freeland,* 7 S. & M. 409; *Shirley* v. *Shattuck,* 6 Cushm. 13; 1 Leading Cases in Equity, 70; *Butler* v. *Haskell,* 4 Desaus. 651; *Johnson* v. *Johnson,* 5 Ala. R. 90.

Chancellor Desaussure, in the case of *Butler* v. *Haskell,* states that this rule is supported by many cases. We may be mistaken in this rule, but if so, it is certain that the authorities, that do sanction a purchase, by a trustee from the cestui que trust, hold

uniformly that the transaction must be free from all taint of fraud; that the very utmost good faith must be observed, and that the trustee must have disclosed all the information he could obtain, and must advise fully; and must prove this when he is assailed. *Fox* v. *MacReth*, 2 Brown Ch. R. 400; *Hawley* v. *Cramner*, 4 Cow. 717; *Prevost* v. *Gratz*, 1 Peters Ct. Ct. R. 364; 6 Wheaton, 481; 8 Vesey, Jr. 337; 10 Ib. 81; 3 Sandford, 61; *Michaud* v. *Girod*, 4 How. U. S. 503; *Butler* v. *Haskell*, 4 Desaus. 651; 1 Stor. Eq. Jur. sect. 317, 321; *Hatch* v. *Hatch*, 9 Ves. Jr. 292; *Walter* v. *Armstead*, 2 Leigh, 11; Lewin on Trustees, 22 Law Library, 197; 1 Lead. Cases in Eq. 169. That the trustees may purchase, is a point of great nicety, and one which the court will watch with the utmost diligence. Lewin on Trustees, 22 Law Library, 192. The exception runs so near the rule, absolutely prohibiting the purchase, that it might be included in it. Ibid.; *Moore* v. *Royal*, 12 Vesey, Jr. 372.

Under this rule let us examine this case. First, as to the price paid for the estate.

Smith paid for the house $2090, and $150 cash, . . . . $2240
Patrick is mistaken when he says $350 cash, as Smith in his answer only claims $150.
For this Smith received of the property belonging to the widow, dower in the Marshall land, worth, . . . $1300
Year's support, . . . . . . . . . 500
Property exempt to her by law, say, . . . . . 150——1950

$290

He therefore paid $290 for the chances in an estate inventoried at near $80,000, and subject to the trust debts of about $24,000. This was a speculation that no court would tolerate between parties thus situated.

How much was the estate worth? It seems Cheairs paid out, in the administration in Tennessee, $3008 beyond assets. This included the very $2090 paid to Mrs. Lewelling, and should not be embraced. Admit it, however. Deduct the $652 received for sale of furniture, and not accounted for, and it leaves $3156 as the result of Cheairs's administration. There is also filed with Cheairs's answer, in a letter to Judge Clayton, a miserably garbled half record, and half

statement of the account of Cheairs, as receiver in the suit, at Memphis. We sent and obtained the transcript of the record, and, by consent of parties, it is filed here as Exhibit BB. It shows payments by Cheairs of over $15,000 on the trust debts, and cannot come in here. It shows payments, including all payments except those to the trust debtors, of $4222, including vouchers 27, 28, to Dowdy for travelling expenses and services. We include the last item of $1032 interest account, for it is impossible that that interest account should have accrued on the debt of $4222; especially when each of the vouchers shows that interest, if any, was included on each item paid. See this account at pages 126, 127, of Exhibit BB.

| | | |
|---|---:|---:|
| He paid out, as administrator, in Tennessee (above receipts), | $3156 | |
| "           as receiver, . . . . . . . | 4222 | |
| As receiver, he received cash (BB. p. 127), . . . . | 2912 | |
| From Smith, as administrator of Woods, in Mississippi (see Record p. 62, Exhibit 2), . . . . . . | 281 | |
| Good debts of Woods & Lewelling, in the hands of the receiver (BB. p. 114), . . . . . . . . | 1487 | |
| Doubtful debts; $484, estimated at half, . . . . | 242 | |
| Key's note, same Exhibit, p. 118, . . . . . . | 209 | |
| Good debts belonging to James Woods, in his hands (see vouchers 93, 94, p. 123, Exhibit BB.), . . . . | 180 | |
| Iron safe (BB. p. 118), proved by Patrick, worth, . . . | 113 | |
| Lumber (BB. p. 86),    "        "        "    . . . | 200 | |
| Cotton-shed, proved by Webb (see his deposition), . . | 500 | |
| Cotton crop of 1850, . . . . . . . . | 2220 | |
| Error in Cheairs's administration account, admitted in his answer, by money received from J. P. Hill, . . . | 175 | |
| do.      do.,    of value of mule, . . . . . | 120 | |
| Agreed estimated value of Virginia lands, . . . . | 1000 | $9839 |
| | | $2421 |

According, therefore, to the settlements made by Cheairs himself, after this suit was brought, without notice, without any one to contest his administration account, he shows that he received $2421 in money, and means more than enough to pay all the debts against Lewelling, and Woods & Lewelling. In addition to this, all his commissions, lawyer's fees, charges for agents, were all allowed.

Smith and Cheairs had, in addition to this sum, all the property embraced in the trust deed, the two negroes in Tennessee, and many thousands of notes, accounts, and bills receivable. Our two witnesses, Harshaw and Hill, prove the mules, stock, wagons, ploughs, &c. &c., on the place, at the time of the purchase, to be at least $2367. No testimony was introduced on this subject by appellants. Starting with these two amounts, let us see what the witnesses for appellants estimate the negroes and land at. These witnesses, Thomas, Rook, Caruth, and Mosely, examined these negroes at the request of appellants, they summoning them for this purpose, and describing the negroes as to age, quality, disease, &c. &c. They estimate the thirty-six negroes, seen by them, as of June, 1851, at $18,400. Four negroes were dead, and Smith and Cheairs state their value at $750, in their answers, making in all, $19,150. We can, therefore, state this account.

| | |
|---|---:|
| Amount received by Cheairs, as receiver and administrator, | $2,421 |
| Value of mules, stock, &c. &c., | 2,367 |
| Value of negroes, | 19,150 |
| "    land, | 4,000 |
| | $27,938 |
| Deduct trust debts, and interest, | 24,938 |
| | $4,000 |
| But Smith sold Cheairs his interest in the notes, &c., at $800, which would make them equal to, | 1,600 |
| Whole value of profits, | $5,600 |

The appellees, by their own showing, make their profits over $5000; a tolerably respectable sum to be made by a trustee out of his cestui que trust. Let us now look and see how our witnesses, Hill and Watkins, who knew the property well, would show this matter. Take Hill first:

| | |
|---|---:|
| Amount received by Cheairs, as administrator and receiver, | $2,421 |
| Value of mules, &c. &c., | 2,367 |
| Cash value of land and negroes, | 28,140 |
| | 32,928 |
| Add value of notes, &c., | 1,600 |
| | 34,528 |

Jones et ux. *v.* Smith et al.

Deduct trust debts, say, .    .    .    .    .    .    .    .    .    . $25,000

Profits according to Hill's proof, .    .    .    .    .    .    .    . $9,528

Watkins values the land and negroes at $3040 more than Hill.

Profits according to Watkins's valuation,    .    .    .    .    .    . $12,568

Harshaw values only a part of the negroes, but as far as he goes, values as high as Watkins; but he knew only a part of the slaves.

Take, therefore, the profits as estimated by appellants, in their answer
    and by their proof, .    .    .    .    .    .    .    .    .    . $5,600
Take our lowest witness, Hill, his estimate is,    .    .    .    .    . 9,528

Divide this sum, .    .    .    .    .    .    .    .    .    . 15,128

                                                                    $7,564

But we insist that appellants had no right to assess amongst themselves the value of the notes, &c. Deduct the value they estimated them at, being the sum of $1600, from the above estimate of profits, $7564, and we have $5964, clear profits, according to the lowest estimate of our lowest witness, and $4000 according to the admissions of appellants.

We will take, however, the estimate as fixed by our lowest witness, and the estimate fixed by appellants, and divide it as above, and then exclude the $1600, and we have as above stated, $5964, say $6000. In addition to this, what did they get? There was $2571 of claims belonging to Lewelling, not collected by Cheairs, as shown by Exhibit 1. (pp. 82, 83, 84, 85.) There was $9411 due Woods & Lewelling, James Woods & Co., and James Woods, and there was the judgment against Sweetland, of over $15,000, making in all bills receivable to the amount of over $27,000. Here then were good assets, $6000, and doubtful ones to $27,000, making in all $33,000, that was received for the sum of $290.

The truth is, that the assets at the time of sale were more valuable as to debts than now. Lapse of time has impaired their value, but as the debts become less valuable, the land and negroes become more so, and it is scarcely probable, that at any moment since the

trade, the appellees have not had a clear profit of over $10,000; certainly not less than that. This would avoid the trade, as the law declares positively, that the trustee shall not make gain by any transaction with the trust fund, or with his cestui que trust. See authorities before recited.

We are not mistaken in our calculations before made. We invoke, however, another rule of law, that will supply our mistakes; a rule that is universally acknowledged, and of the most salutary character. It is this: "If a trustee purchase from a cestui que trust, and sell for a higher price, the sale will be set aside." 1 Stor. Eq. Jur. sect. 321, and authorities there cited. The value of a thing is what it will command in the market. Smith would not sell, but refused from Craddock $3000 for a one-third interest in his profits, and from Gibbons $5000 for his profits, and this too in a few days after the purchase. Had he made the sale, equity would have set aside his purchase from Mrs. L., but he did not make it, because the sum offered was not enough. He virtually said to Craddock, I will not sell my profit for $9000, and to Gibbons, I will not sell for $5000: He was offered a profit, but did not sell because it was not sufficient. If this does not bring him within the above rule, we cannot see what would.

Again, the rule is that a trustee cannot deal with the cestui que trust, until the relation is dissolved, and the parties can trade at arms length. *Shirley* v. *Shattuck*, 6 Cushm. 13; Lewin on Trustees, and authorities there cited; 1 Adams's Equity, 181. The relation was not dissolved when the trade was made, Smith being then trustee, and Cheairs administrator and executor, holding the former character by appointment in term, and the latter by the will.

We submit a few of the reasons that show the unfairness that attended this transaction. 1st. An estate inventoried at nearly $80,000 in less than seventy-two hours after it was named to the legatee, and when the subject was first named, it was received with the greatest disapprobation and dislike.

It was made without reflection and by a lady in the deepest distress. She had no knowledge or information on which she could rely. She was told that the trust debts were pressing, that the money could not be collected, that there was no money on hand to pay, and that the slaves would have to be sold, and told this, too,

by Webb, the agent of Cheairs, and then in his pay; by the agent of the executor in the will in Mississippi, and the administrator of the estate in Tennessee; by the agent of this executor and administrator, who was then secretly, in Smith's name, purchasing the trust estate. She was not informed that there was $2220, then in the hands of the trustee, the proceeds of the crop of 1850. That she was entitled to land in Virginia. That Cheairs as administrator had in his hands assets of $10,000, as he then believed, more than sufficient to pay debts, as Craddock proves. That she had an interest in the Memphis property, out of all which, she might have raised money to pay the first trust debt then maturing, and relieve herself from the immediate sale of a few or any of her slaves. Cheairs kept silence, when he should have spoken; kept silence because a secret trade was being made, in which he was a secret partner. Silence, amounting to culpability, was then kept. And a modest, retiring lady, in distress, so great as almost to unsettle her judgment, was forced, in utter ignorance of her means and affairs, to sell to her trustee, and the executor of her husband's estate, a trust property, amounting to more than sixty thousand dollars. Cheairs comes in, and in his answer swears, that he said nothing to the widow, and gave her no information, and used no means to persuade her to make the trade. This would not do. It was his duty to know the condition of the estate, and to give the information. Smith, too, swears he kept silence. This would not do. He was not dealing with the cestui que trust, who made the deed, but one upon whom death had devolved this character, and who knew but little about the funds. He was trustee, should have known all about the trust fund, and should have made known every fact concerning the fund.

Again. Why this secrecy? Why this smoke-house movement? What did it all mean? Why did Smith inform Hill that he had bought, but requested him not to mention it, as the contract was not yet signed? Was it that he feared Craddock or Gibbons would hear of it, and would bid more? This must have been his only object.

But appellees say, that Mrs. Lewelling affirmed the contract. When? At Memphis, when Smith went to her and told her that he had after much trouble got the deed from Topp; that the debts were heavy, the times squally; that her husband's dead body was

disinterred; that he held $150 of gold, that would transfer those remains to Kentucky; and then offered to rescind. If this was not an insult, I cannot conceive what this chivalrous gentleman would call an insult to a distressed female; and that, too, when the widow, in that very conversation, showed she did not know where her food was to come from the next day, and this too, when her dower interest in the Mississippi and Tennessee property, her year's support, &c., was worth as much as the house and lot in Memphis. But she affirmed the contract by the sale of the house and lot. What interest had either Smith or Cheairs in it? None; none whatever. It belonged to them neither by the trust or the administration. *Haskell* v. *Butler*, 4 Desaus. 651.

But appellees say that they cannot well be placed *in statu quo.* They have all the property, and we offer to pay them every cent they ever advanced; to pay them fully for their trouble, and to do all that is right in making full compensation.

But appellees say the trade was brought about by our agents. Was Webb our agent? He was at the date of the trade, and had been for months before, in the actual employment and pay of Cheairs.

But French! He, the widow's friend; the man who said he wanted to get his neck out of the halter, and felt easy when the trade was made; who told Dowdle, long before the sale was made, that he wanted to have Mrs. Lewelling sell her interest; who told Harshaw that he had effected the trade, and that Smith would make several thousand dollars by it; who told Dowdle that he had effected the trade and that Smith would make $10,000 by it: this too was the friend whose name, Webb (the agent of Cheairs) had named.

But it is said that Webb furnished a list of the property. So far as the evidence shows, he was then the agent of Cheairs, at least in his pay, and he proves it was done at his own instance. In *Fox* v. *MacReth*, 2 Brown's Ch. 400, Fox had sent down Jackman to value the estate, and when he sold to McReth, he had that valuation in his hand; yet the court set aside the sale, where a greater profit was not made than in this case. There is nothing to show that Mrs. Lewelling in her deep distress noticed this paper. Even if she had, it conveyed no definite ideas in reference to the

estate, and the only object it seemed to accomplish was to make her listen more readily to Webb, and to throw away in seventy-two hours her entire interest in the estate. The Statute of Limitations is interposed. This statute is no bar to an express trust. Angel on Limitations, 161–163; *Smith* v. *Calloway*, 7 Blackf. 86; 8 Yer. 145; 7 S. & M. 219; 5 Pick. 321; 7 Humph. 463.

The statute does not apply to courts of equity, but they have adopted a limitation analogous to them in certain cases. But equity adopts no limitation as between trustee and cestui que trust, where no action at law would lie. This point is most ably settled in the case of *Wren* v. *Gayden*, 1 How. Miss. R. 370. We invoke the full aid of that opinion in this case. The same point is again held in *Gay* v. *Edwards*, 1 George Miss. Rep. 230; *Hatch* v. *Hatch*, 9 Vesey Jr. 292; *Waller* v. *Armstead*, 2 Leigh, 11; *Baker* v. *Morris*, 10 Ib. 284; *Michaud* v. *Girod*, 4 How. U. S. R. 503; Lewin on Trustees, 22 Law Lib. 197; *Buckner* v. *Calcotte*, 6 Cushm.

In every case cited by opposing counsel, the plaintiff had either a perfect right to sue at law, or a right to sue both at law or in equity. This distinction must be remembered, and it is commented on in most of the cases cited by them, viz., in 7 J. J. Marshall, 455; 5 English Law and Eq. R. 95; 5 Humph. 293; 7 S. & M. 419. In this latter case the court say the infants could have brought an action for the property, at any time after the sale, and that they ratified it after coming of age.

But suppose the statute may run, in cases of direct, express, technical trusts, where there is an adverse possession. As regards the complainants, that adverse holding could not exist until they had a right of action for the property, on which the adverse possession was predicated. In all cases of personal or real property, the adverse possession of the property is the very foundation and support, and life of the plea of the statute. It must be adverse; that is, there must be a holding of the property itself against some one entitled to its possession; there must be some one entitled to sue for the possession; some one who can disturb the possession of the adverse claimant. Where a party dies, the statute does not run until there is some one in esse, who can claim possession. Mrs. Jones never was entitled to the possession of this property until the deed of trust

was satisfied.   How, therefore, could the possession of defendants be adverse to her when she could not disturb that possession ?

In all cases of particular estates, the remainderman is not barred because he has no right to sue.   He cannot disturb the possession of the occupant ; he cannot strike at the foundation of the plea ; he has no right to sue for possession at all.   Delay is no wrong ; laches cannot be imputed.   The possession cannot be adverse to him, because he cannot disturb it.   The law, like a chivalrous gentleman, will not tie the hands of a man, and then make him suffer by the open adverse words or actions of another, whom he cannot strike.   This doctrine, that there must be some one in esse, capable of suing, some one entitled to immediate possession, before an adverse possession can exist, is fully settled by all well-adjudicated cases.   *McConey* v. *King's Heirs*, 3 Humph. 274–276 ; *Butler* v. *Haskell*, 4 Desaus. 706–709 ; *Collier* v. *Poe*, 1 Dev. Eq. R. 55 ; 2 Story Eq. Jur. sect. 1521 a ; 10 Yer. 383 ; 2 A. K. Marshall, 564 ; 3 Sumner, 475, 482, 486 ; 4 Dana, 574 ; 3 Gill & John. 188. Mrs. Lewelling was in the position above stated from June, 1851, until the determination of the particular estate, to wit, the payment of the trust debts.   The Statute of Limitations could not bar her.   *Livermore* v. *Johnson*, 5 Cushm. 284.

Let us illustrate the above position.   Suppose Williams holds the note of Smith, due three years after date, and the day after the date Smith by fraud, obtains a receipt from Williams in full of the note.   Williams sues four years after the note falls due, but seven years after the date of the receipt.   When does the statute commence running ?   Certainly not from the date of the receipt, but the maturity of the note.   Why ?   No right of action existed at law upon the note until its maturity.   The law will annul the receipt and enforce the collection of the note.   It is true Williams might have gone to chancery and obtained a cancellation of the receipt.   But Mrs. Lewelling could not go into a court of law at all.   She held Smith's obligation to deliver to her certain property in 1854, or as soon thereafter as certain debts could be paid. Smith obtained a fraudulent receipt or release from that obligation in 1851 from Mrs. L.   When does her right of action accrue ? When she is entitled to the property, not before.   Like Williams

she might have gone into chancery before, but she chose to wait like him till the maturity of her obligation.

The truth is, the statute cannot bar in this case. Long delay, it is said, will bar. The delay in this case was not unreasonable. Mrs. Lewelling was in the deepest distress when the contract was made, went off to Kentucky, then to Virginia and New York. Did not return to Mississippi at all. Was not even in Tennessee until about the early part of 1854. Had no means of knowing the state of affairs in Mississippi; but as soon as she and her husband learned, through James Poole, the real state of matters, this suit was at once instituted. Circumstances less pressing than these have been held to excuse, and especially when coverture intervened. *Baker* v. *Morris,* 10 Leigh, 284. The length of time here was scarcely a tithe of that in other cases, where lapse of time was held to be no bar. In the following cases it was greater, and yet held no bar. *Hatch* v. *Hatch,* 9 Ves. Jr. 292; *Waller* v. *Armstrony,* 2 Leigh, 11; *Michaud* v. *Girod,* 4 How. U. S. R. 503; *Butler* v. *Haskell,* 4 Desaus. 706, and the large number of cases cited there; *Collier* v. *Poe,* 1 Dev. Eq. R. 55; *Handley* v. *Snodgrass,* 11 Leigh, 484; and in fact, in almost every case cited in this brief. The books on all hands are full of cases, in which twenty years and over was not unreasonable delay. We do not invoke so great a length of time, but the short delay here, under all the attending circumstances of absence, ignorance of facts, poverty, great mental distress, and coverture, are sufficient to excuse the delay.

Admitting, for argument, that the Statute of Limitations may be pleaded, still real estate was sold by Mrs. Lewelling, and she would be barred only after seven years. *Devoue* v. *Fanning,* 2 John. Ch. R. 252; *Baker* v. *Whiting,* 3 Sumner, 486. The contract must, therefore, be set aside as to land, and, being an entire contract, it must be set aside in whole.

Again, no statute can run as to the administrator of Lewelling, until his qualification as such. Rogers became such after the filing of the bill, and therefore the statute does not bar. *Dowell* v. *Webber,* 2 S. & M. 452; 2 Leigh, 347; 2 Bibb, 537; 10 Yer. 387; 10 S. & M. 100. Set aside the conveyance, and let Rogers, as administrator, take the property to settle debts, and then the position of defendants, relying on the statute, would avail nothing.

They cannot interpose the bar as to Rogers, and they may try it in the Probate Court, when distribution is claimed, and if the sale by Mrs. Jones is set aside, we should not fear the statute there.

In cases of express technical trusts, where there is no remedy at law, the statute does not run.

Where there is an express technical trust, and there is both a remedy at law and in equity, some authorities hold that the statute runs, because the complainant shall not elect the defendant out of a perfect remedy at law, by selecting his own forum. A large number of our opponents' cases fall under this rule.

In cases of implied trusts, the statute runs, because the law creates the right, and the bar will defeat it. The balance of their authorities fall under this rule. They all fall under one or the other of these rules, but no authorities can be found, barring an express, direct, technical trust, where no remedy exists at law.

*Clayton* and *Watson*, for appellees.

We shall first consider the question whether the transaction with the female complainant, was a fraud in law, because that is the strongest ground which the complainants can occupy.

The position of the counsel for the appellants is, that the purchase of trust property, by a trustee from the cestui que trust, is in and of itself a fraud in law, or so nearly akin to it, that a court of equity, without any further proof, will set aside the conveyance. We hold the reverse.

Adams, in his Treatise on Equity, 60, 184, says, " There is no positive rule, that the trustee cannot deal with his cestui que trust. But in order to do so, he must fully divest himself of all advantage which his character as trustee might confer, and must prove, if the transaction be afterwards impugned, that it was in all respects fair and honest."

Hill, in his work on Trustees, 535, thus sums up the doctrine in substance as follows: " The disability of trustees to become the purchasers of the trust estate, is twofold. 1st. Where the trustee attempts to purchase directly from himself; and 2dly, where the purchase is effected by contract between the trustee and his cestui que trust." "In the first case, the disability is much more strictly

enforced than in the other." The contract is not void in itself, but it is so, or rather it is voidable, at the option of the cestui que trust. " Such sales (though prima facie invalid) have often been supported in equity, where it has been shown that the purchase was made with the full consent of the persons beneficially interested; or where the cestui que trusts, by their laches or acquiescence, have debarred themselves from the right of questioning the transaction." It rests with the trustee who relies upon any corroborative circumstances in support of his purchase, to prove those facts.

He then says, p. 55, " The same principles apply, although with not quite the same stringency, to contracts between the trustee and his cestui que trust, for the purchase of the trust estate. Therefore, in all cases of purchases by trustees from their cestui que trust, where the equity is not barred by acquiescence or confirmation, the court will carefully inquire into and sift all the circumstances, in order to ascertain the perfect fairness and propriety of the transaction, and it will rest with the trustee to establish in evidence, that there was a bona fide contract between them. The court, if satisfied as to this evidence, will support the transaction."

In Exparte, Lacy, 6 Ves. Jr. 625, Lord Eldon says : " The rule I take it is this, not that a trustee cannot buy from his cestui que trust, but that he shall not buy from himself." In *Hendricks* v. *Johnson*, 2 John. Ch. 311, Ch. Kent says : " It is well settled (as I had occasion lately to examine in *Davoue* v. *Fanning*, 2 John. Ch. 252), that a trustee may, under circumstances, purchase from his cestui que trust." In *Marshall* v. *Stephens*, 8 Humph. 159, the court say : " A trustee may contract with the cestui que trust in relation to the trust property, provided it be done with good faith, without fraud or imposition." The transaction was there held to be *omni exceptione major*. In reference to dealings between persons standing in a confidential relation to each other, the Supreme Court of the United States say : " We are not disposed to adopt or sanction the broad principle that such deed is void." "But that all such contracts are objects of jealousy, and if not entered into with scrupulous good faith, and are not reasonable under the circumstances, they will be set aside unless third persons have acquired an interest under them." *Jenkins* v. *Pye*, 12 Peters, 253 ; *Taylor* v. *Taylor*, 8 Howard U. S. R. 200.

In *James* v. *Fisk*, 9 S. & M. 151, our own High Court said: "A wife may deal with her husband, or her trustee, in regard to her separate estate, but in either case, the transaction will be watched with jealousy." For want of proof of any unfairness in the matter, on the part of the trustee, the transaction in that case was upheld. In *Sullivan* v. *Blackwell*, 6 Cushm. 742, this court held, that a settlement made by a guardian with his ward, soon after his attaining age, would be looked upon with distrust, and would not be maintained, unless made with the fullest deliberation, and the most abundant good faith. This is just the principle for which we contend. And Judge Story regards guardians and trustees, as occupying the same position. See also *Young* v. *Cook*, Opinion Book F., page 687. In a still more recent case, *Pennington* v. *Acher*, 30 Miss. R. 161, the court appear to have acted upon the same principle.

See, as to the general doctrine on the subject, *Chalmers* v. *Bradley*, 1 Inc. & Walker, 67; *Faman* v. *Brooks*, 9 Pick.; 2 Sugden on Vendors, 130, 137; Jeremy's Equity, 394; Parsons on Contracts, 75; 2 Spence Eq. Jur. 943; *Veasey's lessee* v. *Graham*, 17 Georgia, 99; *Michaud* v. *Girod*, 4 How. U. S. R. 503. The only text writer who seems not to advert to this distinction is Judge Story in his Equity, and he leaves the doctrine in singular confusion.

That a trustee cannot buy from himself, is very generally admitted. See *Davoue* v. *Fanning*, 2 Johns. Ch. 252, and numerous cases; though in South Carolina and some of the other States the rule is greatly qualified. *Stallings* v. *Foreman*, 2 Hill Ch. (S. C.), 405; *Julian* v. *Reynold*, 8 Ala. From this view of the law, we regard it as very certain, that this court will not hold this contract to be void in itself, or void from any principle of policy, or from any disability of the trustee to make the purchase.

*Coles* v. *Trecothick*, 9 Ves. Jr. 235, was a case in which a specific performance was decreed in favor of a trustee purchaser against his cestui que trust.

See the whole doctrine reviewed in notes to *Fox* v. *MacReth*, 1 Leading Cases in Equity, by Hare & Wallace, 150–169.

We shall then proceed to an examination of the facts, in order to ascertain whether, after they have been looked into with all the

jealousy which the cases enjoin, it is a case "free from fraud, free from concealment, and free from all advantage taken by the trustee of information acquired by him in the character of trustee." If so, the contract will be sustained, independent of the circumstances of delay and of confirmation, which we insist exist in the case.

Before entering upon the facts, one or two other matters will be briefly adverted to. One reason for the stringency of the rule is, that "the trustee may have taken advantage of information acquired by him in the character of trustee." But even in those cases which fall under the first class, namely, purchases by trustees of themselves, if the person named as trustee has never accepted or acted in the trust, he is not a trustee; and consequently may purchase the property. Hill on Trustees, 536. In this case, the trustee, Smith, had accepted the trust, but had not acted under it; had not taken possession of the property; and had, therefore, no particular opportunity to obtain information in regard to it in the character of trustee. The same strict rule may not, therefore, be applicable to him.

Again, it may be well to determine precisely what is put in issue by the pleadings, before we proceed to the evidence. A party is not permitted to make one case by his pleadings, and another by his proof; if he could, the cause might be decided upon matter not in issue. *Pinson* v. *Williams,* 1 Cushm. 67; *Kidd* v. *Manley,* 6 Ib. 156. To apply these principles; the original bill states, that the complainant did not know whether the contract of sale was made with Smith, the trustee, alone, or with Smith, the trustee, and Cheairs, the administrator. After the answers came in, an amended bill was filed, in which the contract is alleged to have been made with Smith alone. Of course, this subsequent allegation is a waiver of the first, and is that upon which the case must stand. Yet the court will find complainants have taken proof to establish a fraudulent combination between Smith and Cheairs, and to fix the fact, that it was a joint purchase. This proof is entitled to no weight, when taken in connection with the charge in the amended bill.

Cheairs was one of the administrators with the will annexed of Lewelling, in the State of Tennessee. He never became such in this State. All the trust property, with the exception of two slaves,

was in this State. The grant of administration in Tennessee, was local, and extended not beyond the bounds of that State.

The effort to fix Cheairs with a fiduciary character, in reference to this property, likewise fails upon that ground.

(Here the counsel reviewed the facts at length.)

Next, as to the consideration paid for the property, was it fair, and just, and reasonable, under all the circumstances; or was it so inadequate as to justify a court of equity in setting it aside? See 1 Stor. Eq. Jur. sect. 244; *Liddell* v. *Sims,* 9 S. & M.

It is a fact too of much import, that if any of the notes, secured by the deed of trust, should not be paid at maturity, then that the trustee, at the request of a majority of the parties interested in the trust, should sell all the property, or so much thereof as might be necessary to pay all the debts which were unpaid. Under this power, there is little room to doubt, that upon failure to pay the first notes, the trustee would have been required to sell the whole estate, and apply the proceeds to the payment of the debts. Under such a course, nothing could have been left to the complainant.

It was a most disastrous period for the South. The agitation of the Compromise measures had opened the flood-gates of sectional strife. The policy of Mississippi was the subject of incessant and universal debate, at the very moment of the contract. The price of negroes was lower than it had been for years. Few were willing to invest money in a species of property which threatened the integrity of the Union. The defendants took the risk and purchased under these discouraging circumstances. Times have since changed greatly; and it will not do to apply the standard of to-day, to the transactions of 1851. When we look to that period, and to the evidence in this cause, it will be seen that the defendant paid fully as much for the property, as it would have sold for to any one. The answer of Smith shows, that in his purchase, men were estimated at $800 to $825; women, from $600 to $800; that eleven of the negroes were under ten years of age; four, over fifty, and two or three diseased. Nine of the witnesses examined, concur in stating, that, at the time of the sale, $800 was a fair price for men; $600 to $700 for women. Almost the whole dispute is, as to the price of the negroes. No one doubts the other property was

placed nearly or quite high enough. Particular attention is asked to the depositions of Charles L. Thomas, John Parham, and Thomas Mull. They are men of intelligence and integrity, large planters, residing in the neighborhood, and familiar with the value of such property. Their evidence and estimates stand about as follows:

| | |
|---|---:|
| Land, . . . . . . . . . . . | $4,000 00 |
| Negroes living, . . . . . . . . . | 18,400 00 |
| Negroes who died after purchase, . . . . . . | 700 00 |
| Other personalty, . . . . . . . . . | 2,000 00 |
| Cotton crop of 1850, . . . . . . . . | 2,220 40 |
| Cotton shed in Memphis, . . . . . . . . . | 450 00 |
| Land in Virginia, argued to be worth now, . . . . . | 700 00 |
| Amount charged Cheairs, as administrator, . . . . . | 4,999 97 |
| " charged to him as receiver, . . . . . . | 2,912 16 |
| Estimated value of uncollected assets, . . . . . . | 1,600 00 |
| | $37,982 53 |

This is the total value of all the effects of every kind, which came to the hands of either or both. It will be remembered, however, that nothing in Tennessee or Virginia, nothing outside of Mississippi, was embraced in the deed of trust. As to these, Smith did not bear the relation of trustee. As they are outside the trust, they do not enter legitimately into the consideration of the cause. He could have violated no confidence in regard to them, and they are unquestionably closed by the Statute of Limitations, if no other part of the case is. But without farther reference to this at present, we will proceed to show what they actually paid for the property.

| | |
|---|---:|
| Trust debts and interest up to time of purchase, . . . . | $25,000 00 |
| Amount paid by Cheairs as receiver, exclusive of trust debts, . | 4,222 12 |
| Amount paid as administrator, exclusive of trust debts, . . . | 8,808 59 |
| Amount paid by Smith, exclusive of trust debts, and beyond what he received as administrator of Woods, . . . . . | 518 66 |
| Paid Mrs. Lewelling cash, . . . . . . . . | 150 00 |
| | $38,699 37 |

This estimate is formed upon the testimony of unexceptionable

witnesses, and upon actual settlements made with courts of competent jurisdiction. The action of courts in receiving and allowing them, are, if not conclusive, at least prima facie binding upon the complainants, and cannot be questioned in this collateral mode. Caruthers & Nich. Laws of Tennessee, 80.

The witnesses of the complainant put each of the grown negroes about $200 higher than the witnesses of the defendant. This, and the attempt to charge us with worthless and insolvent debts, constitute the great difference on the one side and the other. But it is obvious that the proof of complainant is entitled to less weight than ours. In the first place, the witnesses are fewer in number; in the next, they are clearly less conversant, from their condition in life, with the value of property; and lastly, they speak from opinion and conjecture, whilst ours speak from actual transactions, in which they took part about that time.

From the foregoing statement, it is very clear that the defendants paid much more for the property, leaving out of view the debts due the commercial house in Memphis, than it was worth. Those debts so far as realized, and so far as there is any hope of collecting them, only make up the value of the estate equal to the amount paid. There is no hope of success to the complainants but to charge the defendants with large sums never received by them. There is no ground upon which to do this; and it seems to us demonstrated beyond all reasonable doubt, that a full and fair price was paid by defendants. That they have shown the contract to be just and reasonable, and above all exceptions.

The court below decided in favor of defendants upon the merits. Unless the evidence preponderates against the decision, this court will not reverse the decree. *Deilard* v. *Wright,* 11 S. & M. 458; *Roden* v. *Gray,* 24 Miss. Rep.

But the contract has been confirmed by complainants. About the 1st of September, 1854, the complainants sold the house and lot in Memphis, which was conveyed to Mrs. Lewelling in consideration of the purchase made from her for $5000. This was more than three years after the transaction. It has passed beyond their reach. This is such an implied ratification of the sale made by her as precludes recovery. In *Scott* v. *Freeland,* 7 S. & M. 409, this court said, " The assent of the cestui que trust to the purchase by

the trustee, in order to ratify the sale, need not be express; it is often implied by circumstances, one of the strongest of which is a failure to take immediate steps to set it aside; so also, receiving the purchase-money, with a knowledge of the sale, is an affirmance of the purchase, and vests the property in the trustee." See also *Campbell* v. *Walker*, 5 Vesey, Jr. 678, note; and Hill on Trustees, 538. This decision is conclusive, we think.

It will be remembered that this is a bill to rescind the contract. If the applicant has been negligent, and there has been a change of circumstances affecting the contract in any material particulars, or if the court cannot put the parties in *statu quo*, it will not interfere in favor of the party who has been thus negligent. *Johnson* v. *Jones*, 13 S. & M. 583; *Liddell* v. *Sims*, 9 Ib. 596; *Ayns* v. *Mitchell*, 3 Ib. 683. In this last case the rule is thus stated: "A complainant who seeks to rescind a contract, must show clearly the defect in the title, and that there has been fraud, accident, or mistake, and then the remedy must have been pursued in good time." Cites 1 S. & M. Ch. 134, 376. There the chancellor said that to rescind after a material change of circumstances, and after delay, would enable the party to commit a fraud. And here we say, that to grant relief in this case, after such delay, and such an unexampled change in circumstances, would work out great fraud and great injustice to the defendants. Their money now is not worth half of what it was when they paid it out. It is wholly impossible to put them in their former condition. It is no answer to say that she was entitled to the property she received. The fact is not so. The lot was not paid for. Lewelling's estate was not able to pay for it, and Smith advanced the money to procure the title. Nor will it avail the complainants to say that the sale was made under the pressure of necessity. Smith had no agency in bringing about that necessity, and it was no part of his duty to avert it, unless by a sale as trustee. Of course he is not responsible for a necessity which was beyond his control, and with which he had no connection, and of which he sought to take no advantage.

The reasonable time within which the suit is to be brought, is the time prescribed by the Statute of Limitations. *Young, Exr.*, v. *Cook*, 30 Miss. 320; Opinion Book F, p. 686. Any delay beyond

that is a bar to the suit; and fraud to take a case out of the statute must be such fraud as would not have been discovered by the use of reasonable diligence. See also *Buchner* v. *Calcote*, 6 Cushm. 597. *Livermore* v. *Johnson*, 5 Cushm. 284, was a case in which certain existing circumstances were allowed to exempt the party from the rule.

We come now to consider the effect of the Statute of Limitations in the case.

The rule is, that whenever the relation of trustee and cestui que trust exists, that relation may be ended by the acts or contracts of the parties, or by a disclaimer of the trust relation, brought home to the knowledge of the party, and from that time the Statute of Limitations begins to run. Angell on Lim. 171; *Willison* v. *Watkins*, 3 Peters, 45 ; *Hughes* v. *Murdock*, 7 S. & M. ; *Patton* v. *Overton*, 8 Humph. 192 ; *Johnson* v. *White*, 13 S. & M. 589; *Veasey's Lessee* v. *Graham*, 17 Georgia, 99 ; *Humphreys* v. *Terrell*, 1 Ala. 654; *Coleman* v. *Davis*, 2 Strob. Eq. 340. This latter case and the case of *Stallings* v. *Foreman*, 2 Hill's S. C. Rep. 405, overrule, in effect, the case of *Butler* v. *Haskell*, 4 Desaus. 651.

In this case, the deed which is assailed, bears date 14th June, 1851, and this suit was brought in February, 1855, more than three years afterwards. This constitutes a bar, unless the complainant can bring herself within some of the exceptions. Her absence from the State, her alleged grief and despondency, have no effect in her favor, unless they were so great as to render her *non compos mentis*. This is not pretended.

It is next said that Mrs. Lewelling had no rights under the will or under the deed of trust, until all the debts were paid, and that the debts were not paid until within three years of the bringing of this suit. She unquestionably took a vested interest under the will. There was no contingency as to her right of enjoyment of the property, subject to the charge for the payment of the debts. This fixed vested interest was as much the subject of contract and sale as if there had been no charge upon it. 1 Powell on Mort., 123, 252. Trusts, possibilities of trusts, contingent interests, and expectancies, either in real or personal estate, are the subjects of assignments. 2 Stor. Eq. Jur. 1040. Of course the purchaser took subject to the charge. Up to the time of the sale the right of the

trustee was held for her; there was a relation of trust between them. From that time the trust ceased as to her, and his possession became adverse to her; not to the creditors, for he had stipulated to hold the property subject to their claims. She could derive no aid from a trust in their favor, after she had expressly stripped herself of all interest under it. From the time of the purchase, Smith held adversely to her; she had the same right to file her bill to rescind the contract on the day after it was made, that she could ever have. As she did not assert her right within the prescribed time, she must be barred. It is a bill to rescind the contract made by herself. Her right to do this does not depend upon any question connected with the trust, which had clearly ceased, or upon any right or interest of the creditors, for she had nothing to do with them. She could only rescind the contract by reason of some vice or defect in it; and if she does not proceed in time, she can derive no aid from a trust in favor of those with whom she had no connection. If she had never sold her interest, then the statute could not have run in favor of the trustee. By the sale, and by the adverse possession of the purchaser, she is barred beyond all question. She cannot be let in to assert any other rights until the conveyance is set aside, for it estops her from so doing.

There is no fraud to prevent the running of the statute. On that head the rule is, that to avail the party, the fraud must be such, that he could not have discovered it by reasonable diligence, within the period prescribed by the statute. *Young* v. *Cook; Stanton* v. *Calcote,* as above.

Neither does the fact, that there was no administrator in this State of her husband's estate, avail her anything. No administration was necessary to enable her to assert her rights in this case. She parted with her rights without an administrator; and none is necessary to enable her to re-assert them. An administrator would have held subordinate to the trust for the payment of the debts. After she had disposed of her rights under the will, an administrator would have held first for the creditors, then for her vendee. She was no longer interested in the estate, and her right to set aside the contract, was in no way dependent upon acts of the administrator. To this suit he is a formal and by no means a necessary party.

Where there are no creditors whose rights can be affected, distributees who are of full age, may agree to terms of division among themselves, and from such time the statute will run in favor of each. *Kilcrease* v. *Shelby*, 1 Cushm. 161; *Henderson* v. *Clark*, 5 Ib. 436. An administrator has only such legal title as is necessary to enable him to execute the trust.

*Clapp* and *Strickland*, on same side.

We think there was no error in the decree of the District Chancery Court dismissing the bill in this case.

The material points presented in the bill and amended bill, and relied upon to obtain a reversal of the decree, are:

1st. That the contract made by the appellees or by Smith, with the female appellant, Mrs. Lewelling (now Mrs. Jones), was fraudulent in law, or at least voidable, at the election of the female appellant, on account of the relation existing between the parties, viz., that of trustee, and cestui que trust.

2d. That the contract was fraudulent in fact, because it was obtained by the appellees, or one of them, taking advantage of the confidential relation existing between them, and the female appellant, to inveigle her into the sale of her interest; because they took advantage of their superior knowledge of the value of the property, and of the pecuniary embarrassment and distress of mind of the female appellant, to obtain the property for a grossly inadequate price.

1st. Was the contract void or voidable, because of the relationship of the parties? There is no doubt as to the rule that a trustee for sale, cannot purchase from himself, or at his own sale, and if he do so, the sale will be set aside, as a matter of course, upon the application of the cestui que trust; but this does not apply to a sale made by the cestui que trust to the trustee. The rule is thus laid down in 2 Phil. Ev. Cow. & Hill, notes, 339, "There is no doubt that the trustee may, in all cases, openly and in his own name, purchase from his cestui que trust, or principal, provided it appear he has made full and fair disclosures of his knowledge, and takes no improper advantage. . . . . . The rule is not that the trustee cannot buy from his cestui que trust, but that he shall not

buy from himself." The rule is similarly stated in 22 Law Library, 192. See also, 1 Lead. Cas. in Eq. 134; *Coles* v. *Trecothick*, 9 Ves. Jr. 234; *Morse* v. *Royal*, 12 Ib. 355; Hill on Trustees, 535–538; and cases cited by authorities above referred to.

There is, then, no room for controversy, as to the fact that the appellee, Smith, regarding him as trustee, had a legal right to purchase from the female appellee, as his cestui que trust; and that the question whether the contract shall stand, does not depend upon the option of the latter, but upon the fact whether the contract was fairly made. Let us inquire, then—

1st. Whether there was any unfairness in the inception of the contract? The bill presents a very strong case, if the charges were true. The female appellant is exhibited in true dramatic style, as an unsuspecting woman, unaccustomed to business transactions, ignorant of the condition of her husband's affairs, and overwhelmed with grief, being entrapped into a bargain ruinous to her interests, by the appellees, Smith and Cheairs, one of whom was the trustee, the other the executor, and both the confidential friends of her husband, whose situation and knowledge of the value of the subject-matter of the contract enabled them to obtain an unrighteous advantage.

The proof utterly annihilates the case presented in the bill, and shows it to be unfounded and fictitious in every particular. We have in the deposition of Hill, who was acting as overseer on the plantation of Lewelling, previous to the contract between Mrs. Lewelling (the female appellant), and the appellee, Smith, on the 14th June, 1851, in his answer to the seventh cross-interrogatory, the history of the origin or inception of the transaction. The witness states that Mrs. L. asked him for his advice, in relation to the affairs of her husband's estate, as to the course which she should pursue, when he declined advising her himself, and referred her to James H. French. If we turn to the deposition of M. P. Webb, we learn the continuation of the affair. From him, we learn that the first suggestion of a sale, by Mrs. Lewelling (now Mrs. Jones), to Smith, was made by him to her, without any knowledge or intention to do so on the part of Smith. He states the reason why he advised Mrs. L. to sell. That he selected Smith as the person to whom he would propose to sell on behalf of Mrs. L., because he had the means to pur-

chase, and the property lay contiguous to that of Smith. That Smith at first declined to purchase, but afterwards gave a conditional assent. That he communicated to Mrs. L. the result of his interview with Smith; and at her request Mr. French paid her a visit, in order that she might advise with him also. He concurred with Webb in the advice he had given,—that it was the interest of Mrs. L. to sell, and brought about the first interview between Mrs. L. and Smith, in relation to the sale. Both of these witnesses swear positively that neither Smith nor Cheairs ever intimated to them a desire to purchase the interest of Mrs. L.; but that they were both actuated solely by their friendship for Mrs. L., and a desire to benefit her.

That the appellees did not take advantage of their fiduciary relation to Mrs. Lewelling, to induce her to make the contract, but that the first overture came from her, through her friends, is a fact in regard to which there can be no dispute, and if we take the statements of Webb, French, and J. M. Patrick to be true, the conduct of Smith and Cheairs in relation to the contract was unexceptionable, and without a suspicion of unfairness from the beginning, to the consummation of the transaction. Patrick proves, that after the writings had been drawn up at Lamar, in Mississippi, he went with Smith in Memphis, Tennessee, to call on Mrs. Lewelling, at which time, Smith told her he was ready to consummate the trade, but he did not wish her to do so without previous consultation with her friends, and her own conviction that it was her interest to make the sale; that she had better have this consultation, and if she were not perfectly satisfied, the whole affair should be dropped. The proof also shows, that Smith went beyond the terms agreed upon in his payment to Mrs. Lewelling.

A good deal of importance is attached by appellants to the position Cheairs occupied in the matter, and the attempt is made to connect him with Smith, in the origin of the transaction. We think the proof shows the contrary, but we regard the point as wholly immaterial, for the reason, that he was no more precluded from dealing with Mrs. Lewelling, than Smith was, and even if the purchase had been from its inception a joint one, it could not affect the legal aspect of the question, and the facts do not certainly connect Cheairs with the dealings between Mrs. Lewelling and Smith rela-

tive to the property, and of course create no suspicion of fraud in fact, on his part.

2d. Let us inquire then, in the second place whether it be true, that Smith and Cheairs availed themselves of their superior knowledge of the value of the property, to obtain it for an inadequate price.

What information did they have that the appellant herself did not possess? Hill, the overseer on her husband's plantation, and who is examined as her witness (answer, cross-interrogatory 4), states that she was frequently on the premises, and had an opportunity to see and judge of the value of the property. Whereas, it is admitted in the agreement of counsel (Record, 95), that Smith never acted as trustee, and had in fact nothing to do with the property until after the termination of the trust, by his purchase from Mrs. Lewelling. Webb, the witness above alluded to, also testifies, that soon after the death of Lewelling, he had furnished Mrs. Lewelling with a statement of the probable value of her husband's estate, made out from the books and other sources, which showed a net balance of upwards of $15,000. This was at least enough to put her upon her inquiry before she disposed of her interest to Smith, and he offered her every opportunity to satisfy herself fully on the subject. There is then a total absence of proof, that Smith and Cheairs or either of them were guilty, either of a *suppressio veri*, or *suggestio falsi*, or that they were possessed of any information as to the value of the property, which was not equally within the reach of Mrs. Lewelling.

It is alleged in the amended bill that Lewelling was at the time of his death, entitled to a landed interest in Virginia, of which Mrs. Lewelling knew nothing, at the time of her sale to Smith. Cheairs in his answer to the amended bill, states that all the information he had on the subject of that interest, he obtained from a letter, shown to him by Mrs. Lewelling before her sale to Smith; and the facts show that the interest amounts really to nothing, or it would have been referred to in the original bill, as Mrs. Lewelling had been on a visit to Virginia, before the original bill was filed, and knew more about the land than Smith and Cheairs, and yet she makes no allusion to it, and does not in her amended bill fix any estimate upon its value.

But is it true in point of fact that Smith did get the property for an inadequate price ? Inadequacy of consideration has never, from Twyne's case down, been regarded as anything more than one of the badges of fraud; and if the transaction be otherwise fair, it requires a very extreme case for the court to interpose and avoid the contract on that ground alone. We insist, however, that from the proof in this case, the price paid was the full value of the property, and if anything, more than its value.

The charges in the bill are, that the property, at the time of the sale, June 4th, 1851, was worth not less than $33,000; that Smith and Cheairs realized also "many thousands of dollars" from the assets of the various mercantile firms with which Lewelling had been connected previous to his death. And the amended bill charges that, in addition to this, they obtained Lewelling's interest in the land in Virginia, in a cotton-shed at Memphis, and some claims in Arkansas and Mississippi, not accounted for in their answers to the original bill, and also two negroes who were not included in the former estimate.

The answers to the original and amended bills states the value of the property received as follows :

| | | |
|---|---:|---:|
| Forty slaves, worth, . . . . . . | $19,165 00 | |
| Deduct amounts paid to extinguish trust deed on two, referred to in amended bill, and included in the number above stated, . . . . | 423 55——$18,741 45 | |
| Section of land embraced in purchase, . . . | | 4,000 00 |
| Mules and miscellaneous property, say, . . | | 2,000 00 |
| Total amount realized from assets of mercantile firms with which L. was connected, . . | | 2,912 46 |
| Cotton crop of 1850, . . . . . . | | 2,220 40 |
| Amount assets collected by Cheairs as administrator, . . . . . . . | | 4,999 97 |
| Amount assets, uncollected, . . . . | | 1,600 00 |
| Value of negroes who died since purchase, and before valuation, . . . . . . | | 700 00 |
| Value of cotton-shed in Memphis, . . . | | 450 00 |
| "   "   land in Virginia, say, . . . | | 700 00 |
| Total, . . . . | | $38,324 28 |

This is the outside value of everything connected with the estate which came to the hands of Smith and Cheairs under the purchase.

The deposition of Hill makes the value of the slaves $24,300, and Thomas Watkins and Harshaw estimate it at about the same, but each of these witnesses admits that the list descriptive of the property was furnished by C. P. Poole, and the whole statement is evidently fabricated to order. A. R. Craddock, another witness of appellant's, estimates the value of negro men, at the time the purchase was made, June 14, 1851, at $1000, and women at $800. This is palpably an exaggerated estimate, and is not supported by any other witness. On the contrary, Parham, Mull, and Cook, three witnesses of appellees, who had been largely engaged in the purchase and sale of negroes about that time, place the figures much lower. Parham estimates men at $800; Mull puts men at $800, and women at $600; Cook estimates them from $550 to $700. Thomas, Rook, Moseley, Caruth, Parham, Mull, Rogers, and Cook, all men of high respectability, and intimately acquainted with the nature of slave property, depose, that so far as the slave property is concerned, its full value has been stated in the foregoing estimate. So, also, with reference to the value of the land, the testimony of Parham and Mull is particularly in point. Both of these witnesses were engaged in large operations of a similar character, about the same time that Smith purchased from Mrs. Lewelling, and, in their opinion, he paid the full value of the property.

As to the value of the assets received from the mercantile firms, with which Lewelling was connected, the depositions of Webb, and J. F. Dowdy, leave no doubt as to their worthlessness. B. A. Jones, one of appellants' witnesses, testifies as to an offer made by one J. C. Gibbons to Smith, soon after the purchase, to give Smith a bonus of $5000 for his bargain; but Jones himself goes on and shows, that, according to the price of negroes at that time, Smith paid their full value. In relation to Gibbons's proposition, Dickerson Rogers testifies, that he had a conversation with him on the subject, in which Gibbons said, he would like to have the young negroes, but did not want the old ones, and that the whole lot would not suit him. Craddock, a witness for appellants, also testifies, that he offered Smith $3000 for one-third interest in the property, but Smith told him he had as many partners as he wanted. The answer gives the reason fully, and states, that on account of Craddock's manner of treating slaves, no humane person would have

had anything to do with him on any terms. Craddock knew the reason very well why Smith declined his offer, and took offence, and his testimony is evidently tinctured with prejudice and ill-feeling.

Taking then, the testimony as a whole, or in detail, the conclusion is irresistible, that we have given a fair and full statement of all the property and effects that came to the hands of Smith and Cheairs, by virtue of their purchase from Mrs. Lewelling.

Let us now look to the consideration paid by Smith, and there cannot be a doubt that he paid the full value of the property. The amount paid may be stated as follows:

| | |
|---|---:|
| Trust debts and interest to June 14, 1851, . . . . . | $25,000 00 |
| Amount paid by Cheairs as administrator, exclusive of trust debts, | 8,808 59 |
| Amount paid by him as receiver, exclusive of do., . . . | 4,222 12 |
| Amount paid by Smith, exclusive of trust debts, and beyond what he received as administrator of Woods, . . . . . | 518 66 |
| Amount paid Mrs. Lewelling, cash, . . . . . . | 150 00 |
| Total, . . . . . . . . . . . . | $38,699 37 |
| Total value of property, . . . . . . . . | 38,324 28 |
| | $375 09 |

Now, if we look at the case as a question of fact as to the fairness of the contract and sufficiency of the consideration, taking the character of the proof, the number of witnesses, and their means of information, we submit that there is no room for doubt; and if it be conceded that, in contracts of this kind, the courts regard them with suspicion, and even throw the onus of proving their fairness upon the person who has contracted with his cestui que trust, has not this requisition in all of its strictness been met? The appellee, Smith, who made the contract, does not occupy the position of a speculator seeking occasion to entrap his cestui que trust into a disadvantageous bargain. On the contrary, he is and was at the time, a farmer by occupation, and showed himself averse to embarking in a hazardous speculation. During Lewelling's life he made no attempt to purchase from him. After his death, he never interfered with the property,—made no suggestion nor intimation that he wished to purchase from the widow after her husband's death. When approached by her on the subject through her

friends, he at first declined; and after he had obtained his own consent to make the venture, he still, up to the last moment, not only afforded her the opportunity to ascertain all the facts, but even urged her to do so.

Taking into consideration the precarious value of slave property at the time the purchase was made, the large amount of debts due, or soon to fall due, which were embraced in the deed of trust, and were therefore a lien upon the property purchased, the tangled condition of Lewelling's affairs, and the insolvency of the various firms with which he had been connected, we submit that the bargain was likely to prove a very hard one to Smith, and it is very certain that but for the energy and credit of him and Cheairs, which enabled them to arrange the trust debts, there is no doubt but the whole of it would have been absorbed in the payment of these debts, and a balance of the indebtedness still left. In *Floyer* v. *Sherard*, Amb. 18, Lord Hardwicke laid much stress on the fact that the proposal for the purchase did not come from Floyer. The rule in this country as to trustees is not as rigorous as the old rule in England, which did not recognize, the right of the trustee to compensation for his services, "lest the trust estate might be loaded and rendered of little value." 2 Lead. Cas. in Eq., pt. i, 317; *Shurtliff* v. *Witherspoon*, 1 S. & M. 622.

The charge of the bill, that Mrs. Lewelling was kept in ignorance of her right of dower, or of any other right, is emphatically denied by the answers, and is not supported by a shadow of testimony. So far as Smith is concerned, he never had any communication or conversation on the subject with Mrs. Lewelling.

The charge that she was prevented by distress of mind from understanding or protecting her interests, will be noticed in connection with the Statute of Limitations, upon which the appellees rely to protect their title or to bar the action. That she was deeply affected by the death of her husband was a natural consequence; but if we believe the testimony of Webb, her grief was not so overwhelming as to prevent her from seeking information from him in regard to the situation of her husband's affairs previous to her sale to Smith, and the overseer, Hill, also informs us that she was frequently on the plantation, and obtained information as to the situation and value of the property there. As to what degree of

mental distress will be sufficient to avoid a contract, the rule is thus laid down in *Forman* v. *Brooks,* 9 Pick. 220: "No degree of physical or mental imbecility, which does not deprive the party of legal competency to act, is of itself sufficient to avoid a contract or settlement with him." The only proof we have of the extent of her grief, certainly falls very far short of this point.

But if there were no other ground upon which the appellees could rest this case, the Statute of Limitations is a conclusive bar to the demand of appellants. The application of the statute is resisted, because of the fiduciary character sustained by appellees. That the statute does not run in favor of a technical trustee, as long as the trust subsists, is not denied, but it is equally true, that it does commence running whenever the trust expires, or is renounced. *Scott* v. *Freeland,* 7 S. & M. 409; Hill on Trustees, 538; *Murdock* v. *Hughes,* 7 S. & M. 234; 13 Ib. 589; *Patton* v. *Overton,* 8 Humph.; *Willis* v. *Watkins,* 3 Pet. 45.

That the statute commenced running from the time the purchase was made by Smith, on the 14th June, 1851, we think, does not admit of a doubt. To rebut this assumption, it is urged that the conduct of Smith, in advertising a portion of the property for sale after the purchase from Mrs. L., shows that he did not regard the trust as having expired. Smith, in his answer, explains why he did this; but without any explanation, what is the inevitable conclusion from the facts? Smith never had possession of the trust property until after his purchase from Mrs. L.; he then took possession under and by virtue of the purchase, and continued to hold and control it as his own, he and Cheairs dividing it between them; and their possession was recognized by Mrs. L., as adverse to any claim on her part. Can there be any doubt that this was, to all intents and purposes, in the absence of any contract, a conversion of the trust property by the trustee, which, if brought home to the knowledge of the cestui que trust, would render the possession adverse, and put the statute in operation? 11 B. Monr. 161.

But we are told that a fraud was practised upon Mrs. L., which prevented the running of the statute until that fraud was discovered. The weight of authority is, that "neither fraud nor ignorance of fraud will prevent the bar of the statute, unless it is specially excepted by the terms of the statute;" for, say the courts,

to engraft exceptions upon the statute, which the statute itself does not recognize, is judicial legislation; and if one exception may be engrafted, so may another, until the statute is construed away entirely. *Hambert* v. *Trinity Church*, 24 Wend. 606, 613, 614; *Davidson* v. *Morris*, 5 S. & M. 571; *Robertson* v. *Alford*, 13 Ib. 512; *Kilpatrick* v. *Byrne*, 3 Cushm. 582; 1 Meigs Dig. 197; 2 Ib. 737; *Farnam* v. *Brooks*, 9 Pick. 246.

It is said that this court has departed from this rule in the case of *Young* v. *Cook*, not yet reported. The extent to which the court go in that case, however, is to hold, that the fraud, which prevents the operation of the statute, must be such as could not have been discovered by reasonable diligence within the time fixed by the statute. Now, even under this modification of the rule, how stands the case at bar? What specific charge of fraud is made in the bill? What act of fraud is alleged to have been discovered, that might not have been discovered as well at one time as another after the date of the purchase by Smith from Mrs. Lewelling? The *grief* of the female appellant is relied upon as an apology for her negligence in asserting her rights, if she had any. We have already referred to the rule in such cases; and surely there is no pretext that her case falls within it. The testimony shows her to have been at the time some thirty years of age, and if the memory of her buried love, a second husband, so weighed upon her heart that

> "Not poppy nor mandragora,
>   Nor all the drowsy syrups of the world,
>   Could medicine"

her to forgetfulness, how happens it that we so soon find her wooed and won by a third husband, and how happens it that after her third marriage she still acquiesced in the contract? Perhaps it may not be uncharitable to suppose that she had passed from one extreme of emotion to the other, and was now as much bewildered and spellbound by the renewed delights of matrimony as she had been by the sorrows of widowhood.

Not only was there an acquiescence on the part of herself and husband, but they actually confirmed the contract by the deliberate act of selling the house and lot in Memphis, which she had received

as a part of the consideration for the sale of her interest. It is true, that the statement of Samuel Poole is relied upon to create the impression that he, for the first time, apprised the appellants of the fraud which had been practised by Smith in the purchase, and that they immediately set out for Mississippi to investigate the matter, and soon afterwards filed the bill in this cause. But it does not appear that Poole communicated any specific act of fraud, or any fraud whatever, or if any, none that might not before have been discovered by reasonable diligence. It does appear, however, from another part of the testimony, that this was not the first time that Mrs. Lewelling had been induced by busybodies to institute inquiries upon the subject.

The truth is, as appears conclusively from all the facts and circumstances of the case, that the suit was commenced purely as a speculation. Smith purchased when property was low, and after he had struggled through the load of debt which encumbered it, and prices had advanced, the appellant, Jones, thinking perhaps that he was entitled to some boot along with the widow, and she anxious to bring a dowry into the concern that would tickle the avarice of Jones, as well as his amativeness, the suit was commenced in the hope that the Poole family would be able to pilot them safely through the mazes of the law by strong swearing, either in person, or by proxy.

To permit them to succeed in accomplishing their object would unquestionably be to enable them to commit a fraud instead of being relieved from one. The decisions of this court are pointed on this subject. 3 S. & M. 683; 9 Ib. 596; 13 Ib. 583.

The appellants are seeking to rescind a contract, which we insist was fairly made and executed on the part of the appellees, and in which the appellant, Mrs. Lewelling, acquiesced, from the 14th June, 1851, to February, 1855, and which both she and her husband, Jones, confirmed in September, 1854, by selling the house and lot, which were received by her as a part of the consideration for the sale of her interest. The doctrine as to laches or negligence in enforcing or rescinding a contract is analogous to that applied to the Statute of Limitations, and an authority upon the one point is frequently applicable on the other. Some of the cases cited above relate to the former doctrine, and need not be again

referred to. There are, however, some one or two points in relation to the rescision of contracts, which deserve special notice; one of which is that a court of equity requires stronger reasons for setting aside a contract than would be deemed sufficient to warrant a decree for its specific enforcement. *Seymour* v. *Delancy*, 3 Cow. 445. Another maxim of general application to such cases is, that upon the rescision of a contract, the court will place the parties where they originally stood; and if one of them has rendered this impossible (as the appellants have done by disposing of the Memphis property), the court will not rescind at the instance of such party. *Johnson* v. *Jones*, 13 S. & M. 583; 1 A. K. Marsh. 227. Again, it is a general rule that an entire contract, as this was, will not be rescinded in part, and enforced in part. *Jopling* v. *Dooley*, 1 Yer. 289–90. There are, it is true, exceptions to this rule; but they are only exceptions, and this case is not one of them. The Statute of Limitations bars the remedy as to the personalty, but not as to the land; but it being an entire contract, cannot be partially rescinded.

Having presented briefly the points of the case, we are willing, so far as we are concerned, to submit it without argument. We have adverted to that portion of the testimony which we deemed material, but have not considered it necessary to refer to that part of it in detail, which is intended to show a combination between Smith and Cheairs, previous to the purchase by Smith. The testimony of Webb and French is so clear upon this point, that nothing could be added to its force. The attempt to attack their credibility signally failed, and their testimony not only bears upon its face the evidence of its entire truthfulness, but is corroborated by the appellants themselves, who amongst all the exaggerated statements of the bill and amended bill, dare not assert that either Smith or Cheairs ever approached Mrs. Lewelling on the subject of purchasing her interest, or intimated their desire to do so to any human being prior to her sale to Smith, when the overture first came from her. From the testimony of Hill, the overseer, it is undeniable that she foresaw the necessity of selling the property to pay the trust debts, and it was simply a question, whether the sale should be public or private. She preferred the latter, as she did not wish the negroes to be "scattered," and in doing so, we have not a

shadow of doubt that she consulted not only their interests but her own, for had the sale been forced, to close the trust, which must have been the case very soon, as some of the trust debts would have been due four days after she sold to Smith, there can be no room for doubt, that the property would have sold for less than enough to pay the debts of Lewelling, and she would have been left penniless.

Looking to the whole case, we cannot doubt that the decree of the vice-chancellor dismissing the bill, will be affirmed.

HANDY, J., delivered the opinion of the court.

This was a bill in chancery, filed by the appellants, for the purpose of setting aside an agreement, made between the appellant's wife and the defendant Smith, under which the defendants claim title to certain personal and real estate.

The allegations of the bill are in substance, that the appellant's wife had been the wife of one S. W. Lewelling, who died in Memphis, Tennessee, in February, 1851, leaving a will, by which he gave all his property to his wife after the payment of his debts, and appointed the defendant Cheairs his executor; which will was probated in Tennessee, and Cheairs became administrator there of the estate, jointly with one Craddock. That the appellants were married in November, 1853. That Lewelling was much embarrassed, and in June, 1850, executed a deed of trust to secure certain debts, amounting to the sum of $23,489, and consisting of promissory notes, payable in one, two, three, and four years, and, to indemnify the sureties on those notes, conveying a tract of land and about forty slaves in this State, to the defendant Smith, as trustee, with power of sale upon default in the payment of any one of the notes, either for the amount of the note then due and unpaid, or for the full amount of the indebtedness, at the option of a majority of the creditors; and if all the notes should be paid without sale, that the property should revert to Lewelling and his wife; that the debts secured were partnership debts of the firm of Woods & Lewelling, and that the property conveyed was worth at the time $33,000, and is now worth $38,000 or $40,000; and that the value of the crops raised on the plantation from 1850 to 1854, inclusive, has been about $4000 per annum. That assets belonging to Woods &

Lewelling, amounting to about $30,000, had come to the hands of the defendants, Smith and Cheairs, who had used them in paying the debts of the firm of Woods & Lewelling, which amounted to but little besides the debts secured in the trust deed.

That after the dissolution of that firm, Lewelling continued to do business in Memphis, and after his death, that assets, amounting to several thousand dollars, came to the hands of Cheairs, but none into the hands of Craddock, his co-administrator ; that soon after Lewelling's death, his widow took up her residence at Cheairs's house, on his invitation, and she afterwards proposed to go to the plantation of her deceased husband, and stay with the family of the overseer, but that Cheairs would not consent to it ; that during the time she resided at his house, he gave her no information as to the condition of the estate, and made a secret arrangement without her knowledge, with Smith, to purchase the entire interest which she had in her husband's estate, for a mere pittance ; that she was approached by persons under the influence of Smith and Cheairs, who persuaded her to sell her interest to them, upon false representations, to which she finally yielded, being destitute and without counsel, and under these circumstances, that she signed a conveyance of her interest, for the joint benefit of Smith and Cheairs, who have since divided the property amongst them, and are now in possession of all the property belonging to the estate of Lewelling ; that before his death, Lewelling had purchased a lot in Memphis, on which was due a balance of $2000, and that Smith and Cheairs, or Smith alone, agreed to pay that balance, and have the lot conveyed to her, which was accordingly done ; that the section of land conveyed by the trust deed was worth $6400, and that she was entitled to dower therein, never having relinquished it, and that her dower was worth more than what she received for her interest in the whole estate; that her interest in the estate was worth $20,000 or $30,000, of which she has been defrauded by the defendants ; that Smith had advertised the tract of land and some of the slaves for sale, under the trust deed, but that there was no necessity for such sale, as the debts secured by the deed had all been paid from other sources ; and prays that the sale be enjoined.

The bill charges, that the consideration paid for the widow's interest in her husband's estate, was grossly inadequate ; that she

was contracting with those who held the property in a fiduciary capacity for her benefit, and the contract was a fraud, both in law and in fact, Smith and Cheairs being fully conversant with the value of the property, and she being ignorant of its value ; that the defendants have refused a bonus at one time of $5000, and at another of $6000, upon their purchase. The bill offers to pay any debts due the defendants, or the creditors of the estate, and take the property and effects, prays an account, and that the conveyance to the defendants be set aside.

The answer of Smith admits his appointment as trustee in the deed, and states that at the time of Lewelling's death, the debts thereby secured were wholly unpaid. That the contract with the widow was made by him on the 14th June, 1851, and two of the notes secured were to fall due in four days thereafter, and there was no money to meet them except some proceeds of the cotton crop of 1850; and the creditors were pressing. That there was little hope of indulgence, and no hope of meeting the debts, but by a sale of the property. That under these circumstances, a person named Webb, who had been the clerk of Woods & Lewelling, and had been employed by the administrators of Lewelling to make collections, came to respondent's house, in company with Cheairs, and made the proposition to respondent to purchase ; he having been engaged for some months in collecting, and had not collected enough to pay his wages and expenses, which facts he had previously reported to the widow, and had furnished her with a statement of the condition of the estate, and had advised her to sell her interest, all of which was done without the respondent's knowledge. That respondent replied to Webb, that he would not make the purchase until she had consulted some friend ; and upon this being made known to her, she desired him to request a person named French to call and see her, which he did. That he was afterwards informed by French, of her intention to sell, of the amount she required, and of her request that respondent would meet her at a specified place. That the meeting took place, and the contract was made upon the terms proposed by herself, after consulting with her friends, without any persuasion either by French or respondent, the act being entirely voluntary on her part. That the contract was entered into with respondent alone, Cheairs not

having taken part in it until some days after its completion. That afterwards, when the agreement was about to be consummated, by conveying the lot to her, he told her that if she was not entirely satisfied, he was willing to let it all drop, and she expressed herself entirely satisfied, and the agreement was then consummated. He insists that the price paid for the property was fully its value, under the circumstances; and that besides the trust debts, he and his co-defendant have paid some seven or eight thousand dollars more than was collected from the assets of the estate, making about $31,430 paid by them for the property. That the settlement of Cheairs with the proper court in Tennessee, of his administration, shows that he is in advance to the estate, $3808; and that in a suit between Cheairs and Woods, the partner of Lewelling, for a settlement of the partnership, it appeared that Cheairs, as administrator of Lewelling, had paid out for debts and expenses, $15,380 more than he had collected of the assets of the firm. He admits the advertisement of the land and some of the slaves, for sale, under the deed of trust, but states that the object of it was merely to pass the title to the property by sale under the trust deed. He admits that the debts of Lewelling have been paid, or assumed by himself and Cheairs, and that Craddock offered him a premium of $3000 for his interest in the purchase, which he declined. He states that the house and lot, conveyed as the consideration for the purchase of the widow's interest, was sold by her and her present husband, the appellants, for the sum of $5000, which took place in September, 1854, and relies on the Statute of Limitations as a defence.

The answer of Cheairs is to the same effect as that of Smith.

An amended bill was afterwards filed, attempting to charge the defendants with large assets, besides those embraced in the trust deed, arising from the firms in Memphis, in which Lewelling was a partner, denying that the settlement of Cheairs as administrator in Tennessee, was binding upon the appellants, or that they were affected by the settlement in the chancery suit, not being parties to those proceedings ; alleging that the widow was absent from this State after the contract was made, and ignorant of the fraud practised upon her, and that this suit was commenced as soon as the fraud was discovered, and charging that there was a tract of land in Virginia worth $2000, of which she had no knowledge, and of

which the defendants were aware at the time of the sale, and have since received rents.

The answers of the defendants deny the material parts of the amended bill, and as to the land in Virginia, state that they know nothing of it except what was derived from a letter shown to Cheairs by the appellant's wife, shortly after Lewelling's death; are ignorant of its value or extent, and have not sold or rented it, nor receive any rent for it.

Upon the final hearing the bill was dismissed; and from that decree the complainants took this appeal.

The first position taken in support of the bill is, that the purchase having been made by the trustee from the cestui que trust, must be set aside, as of course, upon the motion and at the option of the cestui que trust, however fairly it may have been made.

The rule that purchases of the trust property by trustees at their own sales, may be set aside as of course, at the election of the cestui que trust, and a resale ordered, is sanctioned by many authorities. But this right does not exist to the same extent in cases of purchases by the trustee directly from the cestui que trust, or by the consent of the cestui que trust, where the purchase is made by the trustee at his own sale. In such cases the rule is, that the trustee is not under an absolute disability to make the purchase; but that it will be regarded with suspicion, and that it is incumbent on the trustee to show that it was in all respects just and fair, and with the most abundant good faith on his part, and the fullest deliberation upon the part of the cestui que trust, with the aid of all the information possessed by the trustee touching the subject, and which it was his duty to communicate. 1 Lead. Cases in Eq. 125; and the numerous cases in the notes, 150.

It is next insisted that, under the rule thus stated, this sale cannot stand, because the defendants have not only failed to show that fairness and good faith which are required, but the evidence shows a positive advantage taken of the cestui que trust by the trustees in making the purchase. The circumstances relied upon as showing that an undue advantage was taken of the widow in the transaction are, her destitute and distressed condition, her ignorance of the state of her husband's affairs, complicated as they were, and of the value of his property and means, and even the amount of his pro-

perty; the failure of Smith, who was trustee under the trust deed in which she was interested, and of Cheairs, who was administrator of the estate of which she was residuary legatee, to obtain and impart full and accurate information as to the condition of the estate; if indeed they were not actually apprised that it was of much greater value, than the amount of the debts agreed to be paid by Smith in making the purchase; and lastly, the inadequacy of the consideration paid, to the real value of the interest in the property conveyed.

Upon these points many witnesses were examined, and the testimony is very voluminous. But the particulars principally relied upon as showing that a fraud was practised in procuring the sale are, the circumstances under which the widow of Lewelling was advised to make the sale; the fact that Smith and Cheairs were both interested in the transaction, though conducted in the name of Smith alone, and that they were aware that they were making a speculation at the time.

There appears to be nothing in the evidence, in relation to the means employed to induce Mrs. Lewelling to make the sale, to justify the charge that it was the result of fraudulent representations, or that there was a combination for such a purpose between Smith and Cheairs. It was first proposed to her by Webb, who stood indifferent between the parties, and who was intimately acquainted with the affairs of the estate, having been clerk for Lewelling in his lifetime, and having been engaged for several months before the sale in collecting the debts due to the estate. He had previously furnished her with a statement of the condition of the estate, and now, upon full conference with her, advised her to sell if she could get $5000 for her interest, believing that her interest was not worth more than that sum. She was at first disinclined to sell, but changed her mind upon his representations, and desired him to request French to call and see her. He did so, and she consulted with French as her friend, and he advised her to sell, as Webb had done. Webb first mentioned the subject to Smith of his own accord, who declined making the purchase unless she was advised to sell by some friend, and stated that if it was proposed to him after such consultation, he would consider it. After consultation with French, she authorized him to propose the sale to

Smith, which he did, and it was accordingly made by him for her. Some time after this, and when the agreement was about to be consummated, Smith stated to her that she might abandon it, unless she was entirely satisfied with it; and desired her to consult her friends upon the subject. She replied that she was entirely satisfied, stating that it might be doubtful whether, after the lapse of several years, she would get anything after settling up the liabilities of the estate.

In addition to the probability that but little of the estate would be left after paying the debts, as was the opinion of Webb and French, who were well acquainted with its condition, there was strong reason to believe, that the property would have to be sold under the trust deed for the notes secured thereby, and which were about falling due when the sale was made; and she was anxious that the property, which consisted mostly of family slaves, should not be sold and separated. She therefore preferred that they should be sold together to Smith, and thereby prevented from being "scattered," by being sold under the trust deed, which appeared to be inevitable, unless the arrangement with Smith had been effected; and this appears to have been a controlling motive with her in disposing of her interest and making the arrangement with Smith.

It is true that the evidence justifies the belief that Smith and Cheairs were both interested in the purchase when it was made, and that for some reason, which does not sufficiently appear, the name of Cheairs did not appear in it. But it does not appear that any influence or undue means was exerted by either of them to induce her to make the arrangement, or that they had a better knowledge of the condition of the estate than Webb, who had been so intimately connected with it, or that they refused to give her such information upon the subject as they possessed.

There is much testimony with respect to the value of the property and assets of the estate, and considerable disagreement between the witnesses for the respective parties as to the value of the slaves in the trust deed and the choses in action of the estate. The estimated value relied upon by each party appears to be sustained by the witnesses examined by them respectively; and under such a state of disagreement of witnesses, we cannot say that the court

below erred in adopting the valuation proved by the witnesses for the defendants, who are not only unimpeached, but are shown to have had opportunities to form reliable opinions upon the subject.

But there is a circumstance shown by the testimony, tending to cast suspicion upon the purchase of the defendants, with reference to the value of the interest of Mrs. Lewelling in the estate. It is proved that shortly after the arrangement was made, Smith stated that he had made a trade with Mrs. Lewelling by which he and Cheairs would clear $10,000. He also declined an offer made him by Craddock, shortly after the trade, of $3000 for a third interest in it. He also refused an offer of $5000 for the bargain, made by another person shortly after the trade.

It is true that these facts would not of themselves be sufficient generally to set aside a contract on the ground of gross inadequacy of price, nor would they be sufficient to show fraud in procuring the sale. The hazard of taking the property, and, as a consideration, undertaking to pay all the debts of the estate, might be a risk which would justify the purchase of the widow's interest in the estate, if the relation of trustee and cestui que trust had not existed between them; for there would, in such case, be no such evidence of fraud, and no such gross inadequacy of consideration as to vitiate and annul the contract. But when the relation of trustee and cestui que trust exists between the parties, it is the duty of the trustee to show, that he gave all the information in his possession to the cestui que trust, and that he took no advantage whatever of his superior knowledge in relation to the value of the estate; and unless all suspicion against the openness and fairness of his conduct be removed, the sale will be vacated at the election of the cestui que trust. Although, in this case, the value of the purchase, as acknowledged by Smith, may have been based upon a calculation of the prospective profits to be derived from the use of his capital and industry to be employed upon the property, yet, under the stringent rule applicable to cases of this nature, his acknowledgments as to the value of the purchase would tend strongly to show that the consideration paid was greatly less than what he believed its value at the time; and we should be inclined to hold that, on this ground, the sale cannot be sustained, if there was nothing else in the case to show, that upon principles of equity it should not be

set aside. This brings us to consider the only other point which we deem it necessary to notice.

It appears that no step was taken by the appellants to disaffirm the contract until this bill was filed, which was not done until the lapse of three years and about eight months, after the date of the purchase. And in September, 1854, more than three years after the contract was made, the appellants sold the house and lot in Memphis, conveyed by Smith to Mrs. Lewelling, to a third person for the sum of $5000.

It has been held by this court, that the cestui que trust, in cases of this character, may elect to treat the sale as valid, and that such election will be implied from any unreasonable delay in taking steps to set it aside. *Scott* v. *Freeland*, 7 S. & M. 419. In that case, the delay of an heir for about one year after his majority, to institute his suit to set aside a sale, made by the trustee to himself during the heir's minority, was held sufficient to prejudice his right, and the sale was not set aside upon his application. In this case, the delay was much greater. For aught that appears, the facts relied upon to show that an undue advantage was taken of the widow, might have been ascertained at any time after the sale, by proper investigation and vigilance. She remained a widow until November, 1853, resting under the advice given by her friends, French and Webb, under which she had acted. If her forlorn condition during that interval, could constitute a sufficient excuse for her want of diligence, that reason ceased upon her marriage to the appellant, Jones, after which there was no excuse for want of diligence, in inquiring into the transaction and asserting their rights. Yet there was no effort made to investigate the matter until about twelve months after the marriage, and this suit was not brought until the lapse of about fifteen months after that time. During all this time, no act on the part of the defendants is shown calculated to prevent inquiry, or to lull the appellants into security, or to conceal the true nature of the transaction. On the contrary, they appear to have declared openly, their views of the transaction, insomuch that these declarations, which appear to have been fully and frequently made, are the strongest circumstances turned to their prejudice. Under such circumstances, the failure of the appellants to prosecute their rights for so great a length of time, must pre-

clude them from impeaching the sale, and amount in law to a ratification of it. *Scott* v. *Freeland*, 7 S. & M. 419; *Ayres* v. *Mitchell*, 3 Ib. 683.

There may be circumstances of gross fraud and imposition, which would form an exception to this rule, and justify the court in holding that under the peculiar circumstances of fraud and oppression, the guilty party was entitled to no indulgence. But there is no evidence to bring this case within such a rule, no proof of positive fraud or undue influence, practised by the defendants upon Mrs. Lewelling; the sale appears to have been freely and voluntarily made by her, not through the influence or solicitations of the defendants, but under the advice of her own friends, and upon her own proposition; and entered into by the defendants as a speculation, in which they took the hazard, and from which they expected by diligence to realize a handsome profit.

We think, therefore, that the case comes fully within the rule, stated in *Johnson* v. *Jones*, 13 S. & M. 583,—that if the party seeking to rescind has been negligent, and there has been a change of circumstances in any material particulars, a rescission should not be decreed.

And under this view of the case, the decree is correct, and must be affirmed.